[Civ. No. 20842. Fourth Dist., Div. Two. Nov. 27, 1979.]

MARIE MURILLO, Plaintiff and Appellant, v.
GOOD SAMARITAN HOSPITAL OF ANAHEIM,
Defendant and Respondent.

**COUNSEL**

Jeff R. Wheatley for Plaintiff and Appellant.

Moore, Graves & Madory and Richard E. Madory for Defendant and Respondent.

**OPINION**

**THE COURT.**—Plaintiff sued to recover for personal injuries suffered when she fell out of bed while a patient at defendant Good Samaritan Hospital (hereafter hospital). Hospital raised a statute of limitations defense by answer and by motion for summary judgment. This is an appeal by plaintiff from a judgment for hospital following the granting of the summary judgment motion.

Plaintiff's complaint was filed on February 25, 1977. Of interest to this appeal, it alleges: "On or about February 19, 1976, defendants and each of them negligently and recklessly left the rails of the hospital bed down, allowing plaintiff to fall out of bed. Plaintiff continued her stay

in defendants [sic] hospital until February 27, 1976, whereas [sic] she was discharged. Plaintiff was unaware of the cause of her complaints until examined by a physician in another hospital on February 29, 1976."

In support of the motion for summary judgment, hospital filed two declarations. In the first declaration, Jean Pinkerton stated that on February 19, 1976, she was employed by hospital as a nurse's aide. At about 3:15 a.m., she went to plaintiff's room in response to activation of a call button and plaintiff said that she had fallen out of bed. In the second declaration, hospital's counsel authenticated portions of a deposition of plaintiff. In the deposition, plaintiff stated she was admitted to the hospital at the direction of her physician, Dr. Magrann, for treatment of shingles on her lower back. This condition caused severe pain and prevented her from lying on her back. She went to sleep about 10 p.m. on February 18 and awoke some time during the night to find herself on the floor. She stated that it was the impact of hitting the floor which caused her to awake. She tried to get up but lost her footing because the floor was slippery and she again fell. She then activated the call button. She experienced pain in her head, right elbow, and right knee. The person who answered the call button summoned a man who plaintiff assumed was a doctor. The man examined plaintiff's head and told plaintiff she was all right. Plaintiff was assisted back into bed and the bedrails were raised. The rails had been down when plaintiff awoke and she remembered they had been down when she went to sleep. Usually the bedrails were raised at night and lowered during the day. The following day plaintiff was examined by Dr. Magrann and she told him about the fall. By this time she was also experiencing pain in her neck and shoulders.

Based on this evidence, hospital argued that the alleged negligent act —failure to raise the bedrails—was ordinary negligence rather than professional negligence. Accordingly, hospital maintained that the action was barred by the one-year limitations period of Code of Civil Procedure section 340, subdivision (3). In the alternative, hospital argued that if the failure to raise the bedrails was professional negligence as defined by Code of Civil Procedure section 340.5, then the action was still barred because plaintiff immediately discovered her injury, thus triggering the one-year period of section 340.5.

In opposition to the motion for summary judgment, plaintiff submitted two declarations. In the first declaration, plaintiff's counsel

authenticated portions of plaintiff's deposition, hospital's answers to interrogatories, and certain medical records. In the deposition, plaintiff described her mental state when she awoke, after falling out of bed, using the words "dizzy," "dopey," "hazy," and "groggy." The medical records, labeled "parenteral fluid and nurses record" contained notations indicating when bedrails were raised or lowered. In the answers to interrogatories, hospital described the beds provided for patients and also described the medication given to plaintiff on the day before the fall. Plaintiff received: (1) 10 mg. of Valium, an antianxiety drug, at 5 p.m.; (2) 100 mg of Demurol, an analgesic and sedative, at 7:10 p.m. and again at 10:30 p.m.; and (3) 25 mg of Vistaril, a sedative and anti-anxiety drug, at 7:10 p.m. and again at 10:30 p.m.

In the second declaration, plaintiff stated that after the fall she was assured by the physicians and nurses attending her that she had not been injured and consequently, relying on these assurances, she did not discover the cause of her injuries until February 27, 1976, when she immediately requested to be sent to another hospital. She was discharged that day and admitted to a different hospital two days later.

Plaintiff argued, in opposition to the motion for summary judgment, that the job of raising the bedrails was a professional function as indicated by its notation on the medical charts and this was particularly true when, as here, the patient had been given sedatives and tranquilizers. Replying to hospital's alternative contention, plaintiff argued that she was not fully aware that she had suffered appreciable injury until she was discharged from the hospital on February 27.

The court below concluded, as reflected in its minute order, that the applicable limitations period was the one-year period for ordinary negligence specified in Code of Civil Procedure section 340.

On this appeal, plaintiff contends that the court erred in granting the motion for summary judgment.

Code of Civil Procedure section 340.5 fixes the limitations period for a cause of action "against a health care provider based upon such person's alleged professional negligence." Hospital is indisputably a "health care provider" within the meaning of this provision. "Professional negligence" is defined by section 340.5 as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or

wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital."

██ Providing 24-hour inpatient care for a patient being treated for shingles is clearly "within the scope of services for which hospital is licensed." (See Health & Saf. Code, § 1250.) ██ In providing inpatient care, a hospital has a duty to "exercise such reasonable care in treating a patient as his known condition may require." (*Valentin* v. *La Societe Francaise* (1946) 76 Cal.App.2d 1, 6 [172 P.2d 359].) Otherwise stated, a hospital has a duty "to use reasonable care and diligence in safeguarding a patient committed to its charge [citations] and such care and diligence are measured by the capacity of the patient to care for himself." (*Thomas* v. *Seaside Memorial Hospital* (1947) 80 Cal.App.2d 841, 847 [183 P.2d 288].)

In a leading case defining the duty of a hospital, a patient suffered burns when she spilled a teapot of hot water on herself. A jury found the hospital negligent in leaving the teapot by the bedside of the seriously ill and unattended patient. Our Supreme Court held that the verdict was supported by the evidence, stating: "The jury could have inferred that she would have a craving for the tea, and would, in view of the circumstances, underestimate her strength and ability to handle the hot water. Defendant on the other hand was under a duty to observe and know the condition of a patient. Its business is caring for ill persons, and its conduct must be in accordance with that of a person of ordinary prudence under the circumstances, a vital part of those circumstances being the illness of the patient and incidents thereof." (*Rice* v. *California Lutheran Hospital* (1945) 27 Cal.2d 296, 302 [163 P.2d 860].) Thus, the Supreme Court recognized that it is peculiarly the business of hospitals to guard patients against the dangers created by their own weakened and disordered condition.

In another case, the plaintiff broke his hip when he fell out of bed while a patient at the defendant hospital. The evidence indicated that at the time of the fall the bedrails were raised and the plaintiff fell while attempting to climb out at the foot of the bed. However, the evidence also showed that the hospital staff knew that the plaintiff was suffering from a progressive disease of the brain and nervous system and that he was restless and confused during the hours before his fall. Affirming a judgment for the plaintiff, the reviewing court held that there was substantial evidence that the hospital staff was negligent in failing to notify

the plaintiff's physician of his deteriorating condition, and in failing to provide further medication and supervision. (*Gin Non Louie* v. *Chinese Hospital Assn.* (1967) 249 Cal.App.2d 774, 786-791 [57 Cal.Rptr. 906].)

■ In the present case, the question whether it was negligent to leave the bedrails down during the night while plaintiff was asleep is a question involving hospital's duties to recognize the condition of patients under its care and to take appropriate measures for their safety. Thus, the question is squarely one of professional negligence (see *Mount Sinai Hosp. of Greater Miami, Inc.* v. *Wolfson* (Fla.App. 1976) 327 So.2d 883, 884-885) and section 340.5 governs the running of the statute of limitations. The contrary conclusion reached by the court below is erroneous.

Hospital relies heavily on *Gopaul* v. *Herrick Memorial Hosp.* (1974) 38 Cal.App.3d 1002 [113 Cal.Rptr. 811]. There a hospital patient suffering from pneumonia was taken on a gurney for X-rays. After the X-rays were taken, the patient was left unattended; she developed a fit of coughing and fell to the floor, allegedly injuring her spine. When the patient sued the hospital, a judgment of nonsuit was entered against her on the ground that the action was barred by the statute of limitations. Affirming the judgment, the reviewing court held that the action was not based on professional negligence, but rather on ordinary negligence.

The court began its analysis by noting that not every act of negligence by a professional is an act of professional negligence, even where the victim is a client: "No reasonable person would suggest that 'professional malpractice' was the cause of injury to a patient from a collapsing chair in a doctor's office, or to a client from his attorney's negligent driving en route to the court house, or to a hospital patient from a chandelier falling onto his bed." (*Gopaul* v. *Herrick Memorial Hosp., supra,* 38 Cal.App.3d at p. 1006.) The first two examples are apt. ■ The professional duty of a doctor lies in the area of diagnosis and treatment of disease and the condition of a waiting room designed for outpatients ordinarily falls outside the scope of the doctor's professional responsibility. (See *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 432-433 [71 Cal.Rptr. 903, 445 P.2d 519].) Likewise, the professional duties of an attorney do not ordinarily include chauffeuring services. ■ However, we have difficulty with the third example because the professional duty of a hospital, as we have seen, is primarily to provide a safe environment within which diagnosis, treatment, and

recovery can be carried out. Thus if an unsafe condition of the hospital's premises causes injury to a patient, as a result of the hospital's negligence, there is a breach of the hospital's duty *qua* hospital.

The *Gopaul* court next observed that the basic rationale for application of a liberalized statute of limitations to causes of action for professional malpractice is the inability of the layman to immediately detect the occurrence and results of a professional's failure to measure up to the standards of the profession. (*Gopaul* v. *Herrick Memorial Hosp., supra,* 38 Cal.App.3d at pp. 1006-1007.) The court noted that this rationale did not apply to the case before it because "[t]he need to strap plaintiff to the gurney while she was ill and unattended would have been obvious to all" (*id.,* at p. 1007), and therefore concluded that ordinary rather than professional negligence was involved. However, in a rather puzzling disclaimer, the court stated: "The trial court did not conclude, nor do we, that negligence of a professional person or organization which is obvious to a layman may not be 'professional malpractice.' The test reasonably must be whether the negligence occurred within the scope of the 'skill, prudence, and diligence commonly exercised by practitioners of his profession.'" (*Ibid.*)

*Gopaul* was decided under the law existing before enactment of Code of Civil Procedure section 340.5. Whether the case was correctly decided under that law we need not decide. We do conclude, however, that the result reached in *Gopaul* is incompatible with the definition of professional negligence found in section 340.5. ▮ Under that definition, the test is not whether the situation calls for a high or a low level of skill, or whether a high or low level of skill was actually employed, but rather the test is whether the negligent act occurred in the rendering of services for which the health care provider is licensed. When a seriously ill person is left unattended and unrestrained on a bed or gurney, the negligent act is a breach of the hospital's duty as a hospital to provide appropriate care and a safe environment for its patients.

▮ We also reject hospital's alternative argument that plaintiff's action is barred under section 340.5 because she failed to bring it within one year after discovery of the injury. Plaintiff stated in her declaration that the staff of hospital repeatedly assured her that she was all right and that any injuries caused by the fall were inconsequential. She stated that she did not disbelieve these assurances until February 27, less than one year before the filing of her action. This was sufficient to

raise a triable issue of fact concerning the running of the one-year period. (See *Enfield* v. *Hunt* (1979) 91 Cal.App.3d 417, 422-423 [154 Cal.Rptr. 146].)

The judgment is reversed.