[No. D006504. Fourth Dist., Div. One. Aug. 1, 1989.]

BONNIE BELL et al., Plaintiffs and Appellants, v.
SHARP CABRILLO HOSPITAL et al., Defendants and Respondents.

COUNSEL

Miller, Boyko & Bell, Terry D. Harper and Raymond Pepper for Plaintiffs and Appellants.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, William Bailey, Fred Cohen, Horvitz & Levy, S. Thomas Todd, Sharon Swanson and Lisa Perrochet for Defendants and Respondents.

OPINION

**WORK, J.**—After 16 year-old Timothy Burbank died because of surgery negligently performed at Sharp Cabrillo Hospital (Hospital), his mother, Bonnie Bell, sued the hospital for having previously renewed the surgical staff privileges of Dr. Samuel E. Rosenzweig, the negligent surgeon. She asserts the hospital breached its duty to exercise reasonable care in reviewing Rosenzweig's competence when he applied for renewal of his staff privileges. Although she recovered both economic and noneconomic compensatory damages for the death of her son, she contends the trial court erred in refusing to instruct the jury on punitive damages and in reducing the award of noneconomic damages to $250,000 under Civil Code[1] section 3333.2. As we shall explain, we conclude neither contention has merit and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Burbank was taken to the Hospital's emergency room complaining of generalized abdominal pain. Within hours, Rosenzweig, on-call for emergency duty at that time, performed exploratory surgery resulting in complications from which Burbank died 12 days later.[2] Bell's wrongful death and

[1] All statutory references are to the Civil Code unless otherwise specified.

[2] In light of the nature of the legal issues posed by this appeal, it is unnecessary to summarize the circumstances and facts surrounding Burbank's treatment at the Hospital highlighted by the tragic level of Rosenzweig's incompetence.

survival action against the Hospital alleged it consciously disregarded the safety of its patients by granting staff privileges to Rosenzweig without investigating warnings of his possible incompetence. At the end of Bell's case-in-chief, the trial court stated it would not instruct the jury on punitive damages for lack of evidence that the Hospital consciously disregarded the safety of others when reviewing Rosenzweig's application for renewal of staff privileges more than a year before this tragic event. The jury's special verdict found the Hospital's negligence in evaluating and reviewing Rosenzweig's staff privileges was a legal cause of Burbank's death and awarded $100,000 economic damages and $500,000 noneconomic damages. The trial court reduced Bell's recovery for noneconomic damages to $250,000 pursuant to section 3333.2 and also the total award by $40,000, as an offset for monies received from Rosenzweig's estate.

### A. The Hospital's Peer Review Reapplication Procedure

The Hospital reviews each medical staff physician for reappointment every two years. Each physician reviewed submits a "reappointment questionnaire" to the Hospital's medical staff coordinator. The coordinator is a hospital employee, responsible for accumulating the questionnaires and ascertaining as to the status of each physician's license from the Board of Medical Quality Assurance (BMQA). The BMQA report identifies physicians who have reports of adverse action taken against their license or privileges at any particular hospital.[3]

After the medical staff coordinator receives a physician's reappointment application, it is reviewed to determine whether the doctor had admitted an appropriate number of patients to the hospital and had completed a sufficient number of continuing medical education credits. The completed application and the BMQA report are then forwarded to the specific section or supervisory committee (i.e., surgery) to which the physician belonged. Upon review, the department forwards the application with a recommendation to the executive medical committee. Within the context of this case, if there appears to be something warranting further inquiry as to whether the

[3] Business and Professions Code section 805 provides that if a hospital takes an action to revoke, limit or suspend a physician's privileges for more than 45 days, the hospital is required to report this action and the reasons underlying it to the BMQA. Hospitals are then required by Business and Professions Code section 805.5 to inquire of the BMQA whether any other "805 Report" has been filed by any other hospitals against a physician before granting or renewing privileges to a staff physician.

The reliability of this reporting system is questionable; for, it is known to the BMQA that hospitals do not always report such actions, but rather place pressure upon an incompetent physician to resign his privileges. Under such circumstances, no "805 Report" is filed with the BMQA. Criminal sanctions may be imposed upon a hospital for willful failure to report such action, but the criminal sanction is a minimum of $200 and a maximum of $1,200.

physician should be reappointed, it is the chief of surgery's responsibility to make the inquiry or to appoint a committee to investigate and then offer a recommendation to the executive medical committee. After approval by the executive medical committee, the chief of staff takes a list of those physicians approved to the board of trustees, the ultimate governing body of the hospital. However, if at the executive medical committee level concerns are expressed, the matter will normally be referred back to the individual department, where the application should go through the same process again with a more detailed inquiry and another recommendation.

### B. Rosenzweig's Application for Reappointment of Staff Privileges

Rosenzweig's application for reappointment of staff privileges on May 21, 1982, sought senior staff privileges, having had courtesy privileges at the Hospital since 1968. To maintain senior staff status, a physician must handle approximately 12 cases per year.

There is no difference in competency standards between senior and courtesy staff members. Senior (and associate) members must admit a minimum number of patients to maintain their status and participate in committee and other administrative functions at the Hospital. Courtesy staff members have no administrative responsibility or minimum admittance requirement. However, some physicians who admit substantially more patients to the Hospital than the required minimum choose to remain courtesy staff to avoid the required committee and administrative duties attendant to senior status. Rosenzweig's 1982 renewal application disclosed his staff privileges at Grossmont Hospital were not renewed in 1981, because he had admitted too few patients and did not attend the required number of departmental meetings. He further disclosed his privileges at Mercy Hospital had been suspended in February 1975; his request the suspension be lifted in 1978 was denied; and revocation of his surgical privileges at Mercy was recommended in December 1979. Rosenzweig executed a release authorizing the Hospital and any appropriate medical staff committee to obtain information regarding his work at other hospitals. Finally, Rosenzweig's application revealed he did not carry medical malpractice insurance.[4]

The BMQA report of May 17, 1982, characterized Rosenzweig's record as "clear," meaning his license was in good standing and there was no "805 Report" or complaint against him.

Dr. Edward A. Person, the Hospital's chief of surgery, was one of the individuals primarily responsible for reviewing and ultimately approving

[4] In 1980, Rosenzweig disclosed the same information in his "Medical Staff Reappointment Request Form." This form also included an authorization paragraph.

Rosenzweig's reappointment application. Emphasizing the most significant factor in the review process was an evaluation of a doctor's quality of care, Person explained he approved Rosenzweig's application in light of his long tenure (14 years) with the Hospital during which he cared for approximately 150 to 200 patients whose medical histories included only a few, very minor problems and reflecting surgical competence. In concluding Rosenzweig was competent, Person relied on his familiarity with Rosenzweig's work, the Hospital and its staff. Person assumed he would have been aware of any deficiency in Rosenzweig's work at the Hospital, in light of his long tenure since 1968 with the Hospital, and Person's conducting 90 percent of his own practice at the Hospital since he was elected chief of surgery in 1978, and his having performed surgery with Rosenzweig on one or two occasions.

Although Person was apprised of the clear BMQA report, he was also aware of Rosenzweig's disclosures regarding his failure to be reappointed at Grossmont Hospital and his suspension, denial of reinstatement and revocation of his surgical privileges at Mercy Hospital. Nevertheless, Person failed to authorize or make any contact with Mercy Hospital to determine the underlying basis for its action. First, he stated he did not believe another hospital would give that information if requested to do so and, if it did respond, be totally candid. He based this belief on his experience as a hospital staff member since 1968 and the unlikelihood he would personally respond to a request for similar information.[5]

Moreover, Person never asked Rosenzweig directly what had happened at Mercy Hospital, because he preferred not to embarrass him, did not know whether Rosenzweig would be candid with him and felt awkward inquiring about a suspension which occurred seven years before.[6] Person was aware of the formal process normally followed before a suspension or revocation of a physician's privileges and, upon reviewing Rosenzweig's application for reappointment, thought about the process Rosenzweig

[5] Although Person did not believe he would obtain any information from Mercy Hospital if he had forwarded the authorization, he testified that if the chief of surgery at Mercy Hospital telephoned him, information might be communicated informally and conversely if he contacted his counterpart at Mercy Hospital he might be able to obtain the information if he knew the latter personally.

[6] Regarding Rosenzweig's 1980 application for reappointment, Person testified he could not recall whether he made any inquiry of Rosenzweig or Mercy Hospital. However, he affirmatively responded to the following question: "So the only information you had about what had happened to Dr. Rosenzweig's privileges when you reviewed this reappointment questionnaire in 1980 was the statement contained in the explanation on this reappointment questionnaire by Dr. Rosenzweig?"

would have had to have gone through, in all probability, before Mercy Hospital suspended and revoked his surgical privileges.[7]

The apparent inconsistency between the clear BMQA report and Rosenzweig's reappointment application disclosing the action taken against his privileges at Mercy Hospital did not mislead Person in deciding whether to approve Rosenzweig's application. While he knew hospitals were required to file "805 Reports" whenever privileges were suspended or revoked for a period in excess of 45 days, he was also aware the BMQA records went back only 5 years.[8]

Finally, Person testified his 1982 decision to approve renewal was reached after considering input from hospital staff (anesthesiologists, assistant surgeons and nursing staff) concerning Rosenzweig's performance during past years and the chart reviews. As to the latter, medical charts are reviewed by the medical records committee monthly. The committee reviews from 2 to 30 charts selected randomly by the medical records librarian. The committee refers anything which looks "out of sorts" to the appropriate supervisory or subject matter committee. The more surgeries a physician performs at the hospital, the better the statistical basis for determining that physician's competence. Rosenzweig only performed approximately 10 to 11 surgeries annually at the Hospital, while the average physician at the Hospital admitted 6 surgical cases per month or 72 annually. While on the infection control committee, Person personally reviewed three or four of Rosenzweig's charts during routine investigations of patient infections. The charts proved to be fine.[9]

Dr. Vital E. Haynes, chief of staff at the Hospital from July 1982 to 1984, chaired the executive medical committee. He also approved Rosenzweig's

[7] The Hospital had an established complaint process which reviewed specific requests for corrective action made by any staff member. The request or complaint would be directed to the chief of the specific department (i.e., surgery) who would either initially investigate the matter personally or could assign the matter for investigation to another member of the department supervisory committee. If the complaint proved unfounded, the matter would be dropped, usually after a review by the supervisory committee. However, if the supervisory committee determined the matter should be investigated further, an ad hoc committee would be established by the executive medical committee and the physician notified of its formation and requested to appear. After a rather formal proceeding, the ad hoc committee would make a recommendation to the executive medical committee which then could independently review the matter and elect appropriate corrective action.

[8] Parenthetically, we note this reporting requirement did not arise statutorily until January 1, 1976.

[9] Person explained: "[Y]ou can get a reasonable idea about the quality of care rendered that patient by how that chart is written, how it's worded, how the operative note is written if there is one, and nurses notes, how often the physicians saw the patients, what they wrote or did not write."

application. Although he did not personally know how much Person knew about the revocation of Rosenzweig's privileges nor the extent of Person's investigation, he assumed an inquiry was made and relied upon Person's judgment. Nevertheless, without ever enlightening anybody else on the executive medical committee, Haynes independently inquired into Rosenzweig's qualifications. First he spoke with Dr. Elizabeth S. Sarni, chief of the Hospital's emergency room who gave Rosenzweig a very good recommendation, praised him for his promptness and willingness to work in the emergency room on short notice and recommended his approval. Secondly, aware Rosenzweig no longer worked at Mercy Hospital, Haynes spoke in confidence with the chief of staff at Mercy Hospital, a physician with whom he had a long-time professional and personal relationship. He was advised Rosenzweig no longer worked at Mercy Hospital because the anesthesiologists did not want to work with him. To verify this information, Haynes contacted representatives from each of Mercy Hospital's two anesthesia groups, each of whom stated they would not work with Rosenzweig because they were busy enough without working with him. Haynes assumed the real reason they would not work with Rosenzweig was because he did not have medical malpractice insurance and concluded Rosenzweig's lack of insurance was a factor in the revocation of his privileges. Thirdly, Haynes also was personally aware of Rosenzweig's qualifications and considered him competent. He had operated with Rosenzweig on two or three occasions in the late 1960's and during his tenure at the hospital had never heard anything negative about him.

As part of Bell's case-in-chief, Dr. Richard Virgilio, vice chief of surgery at Mercy Hospital since 1979, testified the relevant community standard of care during a reappointment evaluation where a physician has had his privileges taken away by another hospital, requires the chief of staff or the chief of surgery to contact their respective counterpart at the other hospital, requesting any information they could conceivably give regarding the case. Usually, the contact is made by formal letter. If the physician had signed an authorization, the inquiring hospital would at least be entitled to go to the other hospital and review the physician's charts. Should access to the records and information be denied, the reviewing hospital would not revoke a reappointment applicant's privileges based solely on revocation at another hospital if the applicant's performance at the reviewing hospital was competent. Rather, the applicant's performance would be monitored. Moreover, Virgilio conceded, even where the reviewing hospital discovers why the other institution suspended or revoked a physician's privileges, the decision to renew is primarily based on the assessment of the physician's performance at its facility.

Specifically, Virgilio was aware Rosenzweig's privileges were removed at Mercy Hospital for excess morbidity and mortality and believed that

information would have been available to the chief of surgery at any hospital who inquired. In fact, when Rosenzweig applied for reinstatement at Mercy Hospital in 1978, he had not practiced there for three years, requiring Mercy Hospital to contact other hospitals to obtain the necessary information to evaluate the application for reinstatement. Rosenzweig signed an authorization permitting Mercy Hospital to do so and reviewed Rosenzweig's records at four or five other hospitals including Sharp Cabrillo Hospital. Consequently, Virgilio believed Person could have gained access to Rosenzweig's charts at Mercy Hospital pursuant to the authorization signed by Rosenzweig. He agreed that, even with an authorization, a hospital generally provides only vague statements in general terms explaining why privileges were removed, guarding the details surrounding the review process. However, he assumed the inquiring hospital would be permitted to review the charts underlying the hospital's decision.

## The Trial Court Correctly Refused to Instruct the Jury on Punitive Damages

Bell contends the trial court erred in ruling her evidence was legally insufficient to support a punitive damages verdict based on her theory the Hospital's conduct constituted a conscious disregard for the care, safety and well-being of others.[10]

Punitive damages are properly awarded where defendants are guilty of oppression, fraud or malice. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 402 [185 Cal.Rptr. 654, 650 P.2d 1171]; *Neal* v. *Farmer's Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980]; § 3294, subd. (a).)[11] The defendant "must act with the intent to vex, injure or annoy,

[10] "This ruling essentially amounted to the granting of nonsuit as to the issue of recovery of punitive damages for that cause of action. (Code Civ. Proc., § 581c, subd. (b).) 'A nonsuit may be granted only where, disregarding conflicting evidence on behalf of defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff [citation]. Neither the appellate court nor the lower court may weigh the evidence or consider the credibility of the witnesses [citation].' " (*Delgado* v. *Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 275 [203 Cal.Rptr. 672], quoting *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 530 [126 Cal.Rptr. 681].)

[11] Former section 3294 which governs this case, provides in pertinent part: "(a) In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

". . . . . . . . . . . . . . . . . . . . . . . . .

"(c) As used in this section, the following definitions shall apply:

"(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others.

or with a conscious disregard of the plaintiff's rights. [Citations.]" (*Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Neal* v. *Farmer's Ins. Exchange, supra,* 21 Cal.3d at p. 922.) Where nonintentional torts involve conduct performed without intent to harm, punitive damages may be assessed "when the conduct constitutes conscious disregard of the rights or safety of others." (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 158 [181 Cal.Rptr. 784, 642 P.2d 1305]; *Ford Motor Co.* v. *Home Ins. Co.* (1981) 116 Cal.App.3d 374, 381 [172 Cal.Rptr. 59].) " '[A] conscious disregard of the safety of others may [thus] constitute malice within the meaning of section 3294 of the Civil Code. In order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences.' " (*Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 402, quoting *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895-896 [157 Cal.Rptr. 693, 598 P.2d 854]; *Delgado* v. *Heritage Life Ins. Co., supra,* 157 Cal.App.3d at p. 277.) Consequently, to establish malice, "it is not sufficient to show only that the defendant's conduct was negligent, grossly negligent or even reckless." (*Flyer's Body Shop Profit Sharing Plan* v. *Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1155 [230 Cal.Rptr. 276].)

Bell relies on language in *Peterson* v. *Superior Court, supra,* 31 Cal.3d 147, and *Nolin* v. *National Convenience Stores, Inc.* (1979) 95 Cal.App.3d 279 [157 Cal.Rptr. 32], to assert it is not necessary to show the Hospital was subjectively aware of the probability of harm in order to establish the conscious disregard of a victim's safety necessary to prove it acted with the malice justifying punitive damages. Quoting *Ford Motor Co.* v. *Home Insurance Co., supra,* 116 Cal.App.3d at page 381, the *Peterson* court held in pertinent part: "Nonintentional torts may also form the basis for punitive damages when the conduct constitutes conscious disregard of the rights or safety of others. (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890 [157 Cal.Rptr. 693, 598 P.2d 854]; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22 . . . .) 'Nonintentional conduct [conduct committed without intent to harm] comes within the definition of malicious acts punishable by the assessment of punitive damages when a party intentionally performs an act from which he knows, *or should know,* it is highly

"(2) 'Oppression' means subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights."

Section 3294 was amended in 1987 so as to allow punitive damages only when the plaintiff produces "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." (§ 3294, subd. (a).) In addition, the definition of malice was modified in part so as to mean "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (§ 3294, subd. (c)(1).) These 1987 amendments apply to actions in which the initial trial did not commence before January 1, 1988. (§ 3294, subd. (e).)

probable that harm will result. (*Nolin* v. *National Convenience Stores, Inc.* [(1979)] 95 Cal.App.3d 279, 286 . . . quoting and explaining *Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 870. . . .)' " (Italics added, *Peterson* v. *Superior Court, supra,* 31 Cal.3d at pp. 158-159.)[12]

To the extent the court in *Peterson* includes the quote from *Nolin* v. *National Convenience Stores, Inc., supra,* 95 Cal.App.3d at pages 285-286, it is dictum. So also is the language in *Nolin* where the court analyzed differing phrasings of the rule stated in dictum in *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22 at pages 30-32 [122 Cal.Rptr. 218], *Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869-870 [118 P.2d 465], and in *Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d at page 462. *Nolin* found *Donnelly*'s wanton and reckless misconduct standard to be the functional equivalent of *Searle*'s "conscious disregard of safety" and both to be identical with *Silberg*'s standard of "conscious disregard of the plaintiff's rights" when applied to nondeliberate injury. *Nolin* holds the *Donnelly* "wanton and reckless misconduct" standard must be interpreted to include the "evil motive" requirement first announced in *Davis* v. *Hearst* (1911) 160 Cal. 143, 162 [116 P. 530]. The *Nolin* court continued: "Nor does the 'wanton and reckless misconduct' definition of malice authorize an award of punitive damages for 'recklessness' alone. The 'evil motive' for malice is found in 'an *intention* to perform an act that the actor *knows,* or *should know,* will very probably cause harm.' " (Original italics, *Nolin* v. *National Convenience Stores, Inc., supra,* 95 Cal.App.3d at p. 286, quoting *Donnelly* v. *Southern Pacific Co., supra,* 18 Cal.2d at p. 869.) More importantly, *Nolin* expressly recognizes that each of these phrases "have the same meaning in announcing a rule of law that authorizes an award of punitive damages for a nonintentional tort where defendant's conduct which causes injury is of such severity or shocking character that it warrants the same treatment as that accorded to willful misconduct—conduct in which the defendant intends to cause harm." (*Id.* at p. 286.)

In *Taylor* v. *Superior Court, supra,* 24 Cal.3d at page 895, decided before *Nolin* was final, the court echoed *Searle*'s concern with standards based on recklessness as being insufficient to satisfy the statutory and judicial demand for evil motive. In concluding "subjective awareness" was required, the *Taylor* court quoted Dean Prosser within the context of unintentional torts as follows: " 'Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of . . . *such a*

[12] The *Ford Motor* standard was recited without analysis by this court in *SKF Farms* v. *Superior Court* (1984) 153 Cal.App.3d 902, 907 [200 Cal.Rptr. 497], where a crop duster's demurrer was overruled. Thus, the plaintiff's claim for punitive damages was based not only on allegations the defendant "knew or should have known" of harm resulting from crop dusting, but also allegations of oppression and fraudulent concealment. (*Id.* at pp. 906-907.)

*conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.*' " (Original italics, *id.* at pp. 894-895, quoting Prosser, Law of Torts (4th ed. 1971) § 2 at pp. 9-10.) The *Taylor* standard was reiterated in *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at page 402, where the Supreme Court found the defendant liable for punitive damages because the defendant knew a design defect in its automobiles caused brakes to fail. It has been construed by the trial courts to require the plaintiff to show "the defendant (1) *knew* of the (2) *probable* injurious consequences of his conduct and (3) *deliberately* failed to avoid them." (Original italics, *Woolstrum* v. *Mailloux* (1983) 141 Cal.App.3d Supp. 1, 5 [190 Cal.Rptr. 729].)[13]

However, assuming the knowledge element of the "conscious disregard" standard can be satisfied by showing only constructive awareness, the trial court properly refused to instruct on punitive damages. The essence of Bell's argument for establishing malice is as follows: The Hospital delegated the responsibility to review the privileges of each staff physician to its medical staff, giving rise to a structured reappointment peer review process commencing first with the chief of surgery, then the surgery supervisory committee, then the executive medical committee, and finally the board of trustees. Completely protected by privilege (Evid. Code, § 1157), this process is designed to protect patients admitted to the hospital as well as the physicians who come up for reappointment. When adverse action is taken, the physician has extensive rights of review and hearing. Nevertheless, when Rosenzweig submitted information concerning the loss of his staff privileges at Mercy Hospital, Bell claims Person ignored it although he was aware of the elaborate process which Rosenzweig would have gone through losing his privileges. Even armed with a signed authorization by Rosenzweig, Person elected not to contact Mercy Hospital (just as he apparently

[13]The resolution of this conflict cannot be simply accomplished by either characterizing the "should know" language of the *Peterson* standard as dictum or by declaring the reiteration of the *Taylor* "awareness" standard within *Hasson* as impliedly overruling the constructive knowledge aspect of the *Peterson* standard. As to the former, just because that portion of the *Peterson* conscious disregard standard may be dictum does not give us license to ignore its persuasive effect and discard it where it represents a statement of the Supreme Court which may well constitute a correct principle of law within the collective minds of that court, but simply unnecessary for the resolution of the matter pending before it. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 785, pp. 756-757; *San Joaquin etc. Irr. Co.* v. *Stanislaus* (1908) 155 Cal. 21, 28 [99 P. 365].) We are especially hesitant to do so here because the "constructive awareness or knowledge" standard would have been dictum in *Taylor* and *Hasson.* Consequently, confronted with a matter here which may well be resolved by whether such a "constructive knowledge" standard exists and what it would require, we must assume existence or independently analyze the issue, giving due respect to the *Peterson* statement of the rule in the light of the precedent the court relied upon. As to the latter, because inclusion of the "constructive knowledge" phrase or standard would have been dictum in *Hasson,* we cannot declare *Hasson* impliedly overruled *Peterson* within this context.

did in 1980). Aware a clear BMQA report on Rosenzweig would not be definitive, he elected not to ask Rosenzweig what had transpired because he did not want to embarrass him; not to contact his counterpart at Mercy Hospital although pertinent information "might" have been disclosed; not to utilize the authorization to review the charts at Mercy Hospital; but rather, to recommend reappointment and forward the application to the executive medical committee. That committee elected not to investigate, refer the matter back for further investigation, or place Rosenzweig on a monitoring status. Instead, it approved the reappointment and forwarded it to the board of trustees. However, Bell omits certain undisputed material facts.

At minimum, for Bell to prevail, the record must establish the Hospital through its staff elected not to completely perform its duty of inquiring and evaluating Rosenzweig's reappointment application and knew, or should have known, the probable dangerous consequences of that failure and willfully and deliberately failed to avoid those consequences. The evidentiary problem here is that the record lacks any evidence the Hospital knew Rosenzweig was an incompetent surgeon, or that it possessed any facts establishing he posed a threat to patients' safety. There is no evidence that had formal contact been made with Mercy Hospital the reappointment application would have been disapproved or that Rosenzweig would have been placed on a "monitored" status. Moreover, undisputed evidence shows the Hospital's decision was made not in a vacuum. First, all information available at the Hospital where Rosenzweig had practiced for 14 years was known to and considered by both Person and Haynes, each of whom had operated with Rosenzweig and considered him to be competent. Neither had heard anything negative about his abilities from the Hospital staff and personnel they worked with on a daily basis. Haynes and Rosenzweig both also had staff privileges at Sharp Memorial Hospital and Haynes stated he had never heard anything derogatory about Rosenzweig from personnel at that facility as would have been expected were there complaints as to his competency. As Virgilio, Bell's expert witness, testified, surgeons generally know the competence of other surgeons who practice in the same hospital. Haynes sought counsel from Sarni, responsible for the Hospital's emergency room, who strongly recommended reappointment based on Rosenzweig's work in the emergency room. Haynes contacted the chief of staff at Mercy Hospital, albeit informally, and inquired about Rosenzweig's performance. This confidential contact with a long-time friend revealed no information regarding complaints of excess morbidity or mortality. Even so, Haynes went further; he talked with representatives of both anesthesiological teams at Mercy Hospital and was not alerted to any complaints inconsistent with his assumption Rosenzweig's difficulties at Mercy Hospital were directly related to his failure to have personal medical malpractice coverage. A clear

BMQA report, combined with a satisfactory review of Rosenzweig's charts over a period of several years, also added no fuel for suspicion. Under these circumstances with a history of competent performance at the inquiring hospital, even Virgilio implied an earlier suspension or revocation at another hospital would not warrant nonrenewal of staff privileges by the inquiring hospital.

This is not a case where the Hospital intentionally and completely ignored its duty to screen the competence of its medical staff to ensure the adequacy of its medical care. (See *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 346 [183 Cal.Rptr. 156].) Rather, this suit faults a corporate health-care provider for not exercising reasonable care when reviewing the competence of a long-time medical staff member by failing to conduct a complete review by inquiring of another hospital which had revoked that physician's privileges.

Although we would not characterize the Hospital's conduct in this case as either "benign neglect" (see *Seimon* v. *Southern Pac. Transportation Co.* (1977) 67 Cal.App.3d 600, 609 [136 Cal.Rptr. 787]) or inadvertent negligence, given the nature and result of the review of Rosenzweig's 14-year performance at the Hospital, the clear BMQA report and the benign "confidential" information obtained from Mercy Hospital's chief of staff and staff members the facts here are insufficient to impute knowledge to the Hospital that renewal of Rosenzweig's staff privileges without *further* investigation would pose a very probable risk of serious harm.[14]

## THE TRIAL COURT PROPERLY REDUCED THE AWARD OF NONECONOMIC DAMAGES TO $250,000

Bell contends the Medical Injury Compensation Reform Act of 1975 (MICRA) and more specifically section 3333.2, limiting a recovery for

[14] We note also Bell's reliance on *Delgado* v. *Heritage Life Ins. Co., supra,* 157 Cal.App.3d 262, is misplaced. In *Delgado,* the Court of Appeal held a punitive damages instruction should have been given to the jury in part because the defendant insurance company did not investigate a claim by an insured for disability benefits. Emphasizing the risks insured against presuppose that when a claim is made the insured will be disabled and in difficult circumstances, the court held the insurance company knew that if it did not pay the claim the insured would inevitably be harmed. The court first looked at insurance company's interpretation of its ambiguous policy to exclude coverage and found it not inherently unreasonable and thus not conclusive evidence of bad faith. However, the court concluded the insurer willfully and deliberately failed to avoid the adverse consequences of a potential wrongful denial of Delgado's claim when it interpreted his ambiguous claim form in a restrictive manner, failed to respond to inquiries by its insured regarding the rejection of his claim and failed to conduct any investigation into the validity of that claim. (*Id.* at pp. 277-278.) In contrast here, similar knowledge cannot be imputed to the Hospital which did not take any such willful actions, but rather in fact performed a peer review, albeit incomplete.

noneconomic losses to $250,000 in any action for injury against a health care provider based on professional negligence, does not apply to an action for a breach of a hospital's duty to exercise reasonable care in reviewing the competence of its medical staff. (See *Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d 332.) She argues a hospital's breach of its duty to exercise reasonable care in selecting and reviewing the competency of its staff physicians is not "professional negligence" within the meaning of section 3333.2, subdivision (c)(2).

"Professional negligence" is defined within section 3333.2, subdivision (c)(2) as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." Bell limits her attack solely to the issue of whether the Hospital's failure here to ensure the competence of the medical staff through a careful and complete peer review constitutes a negligent act or omission "in the rendering of professional services . . . provided that such services are within the scope of services for which the provider is licensed. . . ."

Language in *Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063], offers guidance regarding the scope of the "professional negligence" language of MICRA. There the court considered whether the MICRA statute of limitations (Code Civ. Proc., § 340.5) applied to an action against a psychiatrist sued for failing to warn a potential victim of the dangerous proclivities of a patient, in breach of the duty of care recognized in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]. Similar to section 3333.2, the statute of limitations there applies only to actions based on a health care provider's alleged "professional negligence." The essence of the defendant's argument in *Hedlund* was that the action did not fall within that category because a psychiatrist's failure to protect potential victims of his patient was ordinary negligence not involving failure to render professional services. The Supreme Court concluded the duty to warn was "inextricably interwoven" with the psychiatrist's professional and diagnostic responsibilities. (*Hedlund* v. *Superior Court, supra,* 34 Cal.3d at pp. 703-704.) Noting first that diagnosis of psychological, emotional and mental disorders is a professional service for which a psychologist is licensed as well as the decision to warn and the manner in which that warning is given involved matters of professional judgment (*id.* at p. 703), the court explained: "*Tarasoff* recognizes a right to expect that a licensed psychotherapist will realize when a patient poses a serious danger to another and, if that potential victim is identifiable, will act reasonably to

protect the victim. The diagnosis and the appropriate steps necessary to protect the victim are not separate or severable, but together constitute the duty giving rise to the cause of action." (*Id.* at p. 704.) Consequently, "*Hedlund* does demonstrate that MICRA's reference to actions based on 'professional negligence' is not strictly limited to classic sponge-in-the-patient medical malpractice actions . . . ." (*Waters* v. *Bourhis* (1985) 40 Cal.3d 424, 432-433 [220 Cal.Rptr. 666, 709 P.2d 469].)

Further, in *Murillo* v. *Good Samaritan Hospital* (1979) 99 Cal.App.3d 50 [160 Cal.Rptr. 33], the court addressed the issue of what constitutes "professional negligence" within the meaning of Code of Civil Procedure section 340.5 where the health care provider is a hospital. The court held an action for a hospital's negligence in leaving the bed rails lowered during the night while plaintiff was asleep and drugged was one for professional negligence governed by the statute of limitations set forth in Code of Civil Procedure section 340.5. The court noted the professional duty of a hospital "is primarily to provide a safe environment within which diagnosis, treatment, and recovery can be carried out. Thus if an unsafe condition of the hospital's premises causes injury to a patient, as a result of the hospital's negligence, there is a breach of the hospital's duty *qua* hospital." (*Murillo* v. *Good Samaritan Hospital, supra,* 99 Cal.App.3d at pp. 56-57.) The court further expounded on the meaning of the same definition of professional negligence we have here as follows: "[T]he test is not whether the situation calls for a high or a low level of skill, or whether a high or low level of skill was actually employed, but rather the test is whether the negligent act occurred in the rendering of services for which the health care provider is licensed." (*Id.* at p. 57.) (See also *Taylor* v. *U. S.* (9th Cir. 1987) 821 F.2d 1428, 1432, echoing the *Murillo* standard and holding the hospital "had a professional duty to prevent Taylor's husband from becoming separated from his ventilator, regardless of whether separation was caused by the ill-considered decision of a physician or the accidental bump of a janitor's broom.")

The decision in *Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at page 346, imposing a general duty of care to "hold a hospital . . . accountable for negligently screening the competency of its medical staff to insure the adequacy of medical care rendered to patients at its facility" was predicated upon judicial and legislative recognition that a hospital has a professional responsibility to insure the competence of its medical staff through careful selection and periodic review. Although once established the medical staff may well be self-governing, it is the hospital working with its medical staff pursuant to the hospital's bylaws, rules and regulations which is responsible for organizing and implementing procedures to select and reappoint staff. Thus, we conclude the competent selection and review of

medical staff is precisely the type of professional service a hospital is licensed and expected to provide, for it is in the business of providing medical care to patients and protecting them from an unreasonable risk of harm while receiving medical treatment. Employing the terminology in *Hedlund,* the competent performance of this responsibility is "inextricably interwoven" with delivering competent quality medical care to hospital patients.

Of special pertinence here where Burbank was an emergency room admittee relegated to the care of on-call staff, is our recognition in *Elam* that the public's perception of a contemporary hospital is one which is "a multifaceted, health-care facility responsible for the quality of medical care and treatment rendered." (*Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d at p. 344.) Recognizing the patient's reliance upon the effectiveness of this highly integrated health care provider, we further explained: " '[t]he concept that a hospital does not undertake to treat patients, does not undertake to act through its doctors and nurses, but only procures them to act solely upon their own responsibility, no longer reflects the fact. The complex manner of operation of the modern-day medical institution clearly demonstrates that they furnish far more than mere facilities for treatment. They appoint physicians and surgeons to their medical staffs, as well as regularly employing on a salary basis resident physicians and surgeons, nurses, administrative and manual workers and they charge patients for medical diagnosis, care, treatment and therapy, receiving payment for such services through privately financed medical insurance policies and government financed programs known as Medicare and Medicaid. Certainly, the person who avails himself of our modern "hospital facilities" (frequently a medical teaching institution) expects that the hospital staff will do all it reasonably can to cure him and does not anticipate that its nurses, doctors and other employees will be acting solely on their own responsibility.' " (*Id.* at pp. 344-345, quoting *Johnson* v. *Misericordia Community Hospital* (1981) 99 Wis.2d 708 [301 N.W.2d 156, 164].) Because a hospital's effectiveness in selecting and periodically reviewing the competency of its medical staff is a necessary predicate to delivering quality health care, its inadequate fulfillment of that responsibility constitutes "professional negligence" involving conduct necessary to the rendering of professional services within the scope of the services a hospital is licensed to provide.

Bell asserts that to allow a hospital to shield itself from liability for all noneconomic damages it causes by applying the MICRA limitations will reduce the impact of the *Elam* duty by frustrating its encouragement of hospitals to carefully screen the competency of their medical staff. This policy concern is irrelevant in light of our finding our construction of the term "professional negligence" is entirely consistent with and furthers the legislative intent underlying MICRA. (See *Hedlund* v. *Superior Court,*

*supra,* 34 Cal.3d at p. 704.) As we recognized in *Elam*: "[I]mposing hospital-corporate liability does not interfere with the Legislature's comprehensive efforts to ameliorate the integrity and quality of the health care system (see, e.g., Stats. 1975, 2d Ex. Sess., ch. 2, pp. 3978-4007), but rather supplements the efforts by encouraging hospitals to actively oversee the competence of their medical staff and the quality of the medical treatment rendered on their premises, while providing victims with an additional avenue for relief. Simply stated, the Legislature has not attempted to immunize the hospital from liability arising from its negligence. Instead, the underlying statutory intent of the cited legislative campaign is the protection and furtherance of the health care interest of the patient." (*Id.* at p. 347.) (7) We echo this declaration today, mindful the legislative stratagem in MICRA was, first, to reduce the number and severity of medical malpractice injuries by erecting a framework to assure medical quality affording governmental oversight of the education, licensing and discipline of physicians and health care providers; second, to reduce the cost and enhance the efficiency of medical malpractice litigation by revising legal rules applicable to such litigation; and third, to curtail unwarranted malpractice insurance premium increases by establishing procedures to review substantial rate increases and authorizing alternative insurance coverage programs. (*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 363-364 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233]; *Barme* v. *Wood* (1984) 37 Cal.3d 174, 179 [207 Cal.Rptr. 816, 689 P.2d 446]; 7 Pacific L. J. (1975) 544, 545.) In light of the comprehensive legislative scheme regulating the quality of health care provided by contemporary hospitals, the ability of a plaintiff to recover all economic, pecuniary damages resulting from the injury in section 3333.2 (see *Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 159 [211 Cal.Rptr. 368, 695 P.2d 665]), and other social and economic pressures on hospitals to remain competitive in the health-care marketplace, we are confident our hospitals will not be less responsible in monitoring the competency of their medical staff to ensure the adequacy of medical care rendered to patients at their facilities because of our holding.

## Disposition

The judgment is affirmed.

Benke, J., concurred.

**WIENER, Acting P. J.,** Concurring.—Notwithstanding the apparent conflict in Supreme Court precedent on this issue (see maj. opn. *ante,* at pp. 1044-1046), I am of the opinion there must be evidence that the defendant was subjectively aware of and deliberately failed to avoid the probable

dangerous consequences of his conduct before the court is obligated to instruct on the issue of punitive damages. I tend to think the "should know" language in *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 158 [181 Cal.Rptr. 784, 642 P.2d 1305] and *Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869 [118 P.2d 465] is dictum and may properly be disregarded as such when compared with the more explicit statements in *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895-896 [157 Cal.Rptr. 693, 598 P.2d 854] and *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 402 [185 Cal.Rptr. 654, 650 P.2d 1171]. Even if *Peterson* and *Donnelly* were direct holdings on the standard necessary for an award of punitive damages, the inconsistency in Supreme Court precedent would require that we choose the appropriate rule. (See generally *People* v. *Simon* (1986) 184 Cal.App.3d 125, 133-134 [228 Cal.Rptr. 855].)

When the purposes of tort recovery change from compensation to punishment for "malicious" conduct, the "should know" formulation provides an insufficiently definite standard which blurs too easily into "mere negligence." Where a jury determines that a defendant did not realize the risk he was creating, compensatory damages provide an adequate deterrent. Inferentially, had he realized the danger, he would have taken steps to avoid it. A different kind of social risk, however, is created by the defendant who actually appreciates the substantial risk he is creating but nonetheless deliberately disregards the probable harm. In those cases, the defendant's culpability approaches that of an individual who intends to cause injury and thus justifies the award of punitive damages.

In this case, because there was no evidence that the hospital knowingly disregarded a substantial likelihood of harm, I believe the trial court correctly refused to instruct the jury on the issue of punitive damages. Accordingly, I concur in the result reached by the majority. I also fully concur in the majority opinion to the extent it affirms the trial court's reduction of the jury award to reflect the $250,000 limitation of Civil Code section 3333.2.