[Civ. No. 68237. Second Dist., Div. Six. Aug. 8, 1983.]

ELAINE M. BUNDREN, Petitioner, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
LOS ROBLES REGIONAL MEDICAL CENTER, Real Party in Interest.

**COUNSEL**

George S. Vorgitch for Petitioner.

No appearance for Respondent.

Archbald & Spray and Ann G. Diener for Real Party in Interest.

**OPINION**

**STONE, P.** ██ ██ ██ Elaine M. Bundren (hereafter referred to as Petitioner) seeks a writ of mandate to compel the trial court to vacate its order granting partial summary judgment on her cause of action for

intentional infliction of emotional distress against Los Robles Regional Medical Center (hereafter referred to as Los Robles).[1]

■ A trial court is justified in granting summary judgment only if "the declarations filed in support of it, strictly construed, contain facts sufficient to entitle the hospital to judgment, and those of the plaintiff, liberally construed, show that there was no issue of fact to be tried." (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) Where reasonable parties may differ, the question is for the jury to decide. (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947].) Our review of the record reveals that a triable issue of fact does exist and, therefore, a peremptory writ of mandate will issue.

On February 4, 1981, petitioner filed a complaint against Los Robles seeking actual and punitive damages for negligent and intentional infliction of emotional distress. On February 3, 1983, Los Robles filed a motion for partial summary judgment seeking dismissal of petitioner's cause of action for intentional infliction of emotional distress. In the main, Los Robles asserted that its method of seeking to collect from petitioner was in a manner which was consistent with common business practices. (*Girard* v. *Ball* (1981) 125 Cal.App.3d 772 [178 Cal.Rptr. 406]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 395 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

In opposition to the motion for partial summary judgment, petitioner filed the following declaration: "I was admitted to Defendant Los Robles Regional Medical Center on January 11, 1981, for elective surgery to be performed on the following day.[2] Upon my admission I filled out all necessary forms presented to me including but not limited to required medical insurance information, financial responsibility, and general background information.

---

[1]Petitioner's amended complaint alleges causes of action for intentional and negligent infliction of emotional distress against Los Robles. The remaining four causes of action in her amended complaint seek recovery from her insurance carrier and are not at issue in this petition. Since five of petitioner's six causes of action remain pending, there is no final judgment from which an appeal will lie. (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 806 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].) Inasmuch as the trial court's order bars a substantial portion of petitioner's case from being tried on the merits, a petition for writ of mandate to vacate the order may be properly entertained. (*Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553, 557-558 [145 Cal.Rptr. 657].)

[2]Petitioner was to undergo elective surgery for repair of wounds suffered as a result of a machete attack upon her in 1979.

" . . . . . . . . . . . . . . . . . . . .

"The surgery was performed on January 12, 1981.

"The following day, January 13, 1981, during the evening dinner hour, while still under the effects of surgery, I was called by Defendant's business office. My mother, Mary Bold, was visiting me at the time. Prior to the telephone call, which was received by my mother, no one from the hospital nursing staff inquired as to my physical status or if I was to receive a telephone call from the business office.[3]

"The caller identified herself as someone from the business office and informed me that my insurance carrier had denied coverage and then proceeded to question me on how I was to pay the hospital bill. The caller continued a pattern of inquiry as to where I could obtain money, how I could apply this to be bill, and when they could expect payment. I had no response to her question as I did not know at the time how I could make the payments or where the source of funds would come from. I asked that the caller speak with my attorney. The caller did not seem to be interested in anything I said other than wanting some commitment regarding the payment of the hospital bill. Her questioning continued at least for 20 to 30 minutes. Her mannerism was abusive, rude and inconsiderate.

"As the caller continued her questioning, I became more upset and finally I was unable to continue the conversation. I believed that I would be discharged if I did not make a commitment toward payment of the medical bill.[4] I began to cry uncontrollably and my mother, who was observing my reaction to the telephone call, came to my aid, and the telephone call was terminated.

"I immediately felt sick to my stomach and could not stop crying. Although it was not the time of the month for my period, I shortly thereafter had a spontaneous menstrual flow and was required to go to the washroom to clean myself and allow the nurses to change the bedding.

"My evening meal was left uneaten, and I thereafter requested a sedative which was brought to me by the nurse."

---

[3]In support of its motion for partial summary judgment, Los Robles submitted a declaration from the nurse on duty in petitioner's ward. The nurse stated that at approximately 5 p.m., on January 13, 1981, she "received a telephone call asking whether Mrs. Bundren was in a sufficient physical condition to receive a call. [She] . . . indicated that Mrs. Bundren's physical condition was such that she could receive a telephone call."

[4]Although petitioner was never threatened with removal from Los Robles, she asserts that the effects of the prior surgery and her weakened condition caused her to fear immediate expulsion from the facility.

At the hearing on February 24, 1983, the court granted Los Robles' motion, holding that no triable issues of material fact existed as to petitioner's cause of action for intentional infliction of emotional distress. Judgment in favor of Los Robles on the sixth cause of action was entered on March 2, 1983.

■ At the outset, we recognize that the attempted collection of a debt, by its very nature, often causes the debtor to suffer emotional distress. Frequently, the creditor intentionally seeks to create concern and worry in the mind of the debtor in order to induce payment. However, in a society greatly dependent upon the extension of credit, it is important that a creditor be allowed a certain degree of freedom in demanding payment. (*Czap* v. *Credit Bureau of Santa Clara County* (1970) 7 Cal.App.3d 1, 5 [86 Cal.Rptr. 417]; *LeDoux* v. *Credit Research Corp.* (1975) 52 Cal.App.3d 451, 455 [125 Cal.Rptr. 166].) As stated in *Dawson* v. *Associates Financial Serv. Co. of Kan., Inc.* (1974) 215 Kan. 814 [529 P.2d 104, 110]:

"When one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy. [Citation omitted.] In the debtor-creditor situation the right of a debtor to privacy is subject to the right of a creditor to take reasonable steps to collect the debt. [Citation omitted.]

"In this area of the developing law, the business community must be given some latitude to pursue reasonable methods of collecting debts even though such methods often might result in some inconvenience or embarrassment to the debtor. [Citation omitted.] Debtors cannot object to some inconvenience in connection with their creditor's efforts to collect a debt. It has been held that debtors' tender sensibilities are protected only from oppressive, outrageous conduct. [Citations omitted.]"

While it is recognized that the creditor possesses a qualified privilege to protect its economic interest, the privilege may be lost should the creditor use outrageous and unreasonable means in seeking payment. (*Bowden* v. *Spiegel, Inc.* (1950) 96 Cal.App.2d 793, 795 [216 P.2d 571].)[5] The applicable test is whether or not the creditor goes beyond "all reasonable bounds of decency" in attempting to collect the debt. (Rest. 2d Torts, § 46.) Under

---

[5]Indeed, the widespread existence of abusive debt collection practices has been the subject of congressional legislative findings in the Fair Debt Collection Practices Act. (15 U.S.C. § 1692; see also Civ. Code, § 1788.1.)

the view set forth in the Restatement, a collector who happens to demand payment in a rude and insolent manner is not liable unless other factors are present. (*Id.*, § 46, com. e, illus. 8, p. 75.) Such "other factors" may be supplied where the creditor has knowledge that the debtor is susceptible to emotional distress by reason of some physical or mental condition.[6]

Case law provides illustrations of the Restatement rule. In *Dawson* v. *Associates Financial Serv. Co. of Kan.*, *supra,* 529 P.2d 104, the court reversed the judgment in favor of a creditor where the evidence revealed that the creditor made telephone contacts to the debtor and her parents demanding payment and threatening repossession while it had knowledge that the debtor was suffering from multiple sclerosis. The court, in *Christensen* v. *Swedish Hospital* (1962) 59 Wn.2d 545 [368 P.2d 897], found that plaintiffs stated a cause of action for intentional infliction of emotional distress where it was alleged that the hospital had knowledge of plaintiffs' advanced age and poor physical health but nonetheless phoned and wrote to plaintiffs demanding payment and threatening criminal prosecution.

Likewise, liability has been found in instances in which the collector has been aware of a debtor's bad heart (*Personal Finance Co. of Atlanta* v. *Loggins* (1935) 50 Ga.App. 562 [179 S.E. 162]); physical hypertension (*Clark* v. *Associated Retail Credit Men* (D.C. Cir. 1939) 105 F.2d 62); advanced pregnancy (*Digsby* v. *Carroll Baking Co.* (1948) 76 Ga.App. 656 [47 S.E.2d 203]; *Kirby* v. *Jules Chain Stores Corporation* (1936) 210 N.C. 808 [188 S.E. 625]); heart condition (*Interstate Life & Accident Co.* v. *Brewer* (1937) 56 Ga.App. 599 [193 S.E. 458]); blindness (*Turman* v. *Cen-*

---

[6]Section 46, comment f states: "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."

The late William Prosser, in his article entitled, *Insult and Outrage,* 44 California Law Review 40, at page 50, provides an excellent example of the situation referred to in comment f. "A California case two or three years ago, which never reached the courts, may serve as an illustration. The defendant was a landlady, a battleship of the first class of the termagant navy, who had for a tenant an invalid with a heart condition so precarious that, as she was informed, the two or three steps at the entrance were actually a menace to his life. When he told her that he was leaving for other quarters where he could enter on the level, she shouted epithets at him, calling him a God damned old son of a bitch and other choice terms, and continued, in spite of the frantic protests of his wife, for two or three minutes until he suddenly dropped dead at her feet. Few will have any doubt that the defendant's counsel were well advised to settle. Any California court, or jury, could be expected to do only one thing with the case."

*tral Billing Bur., Inc.* (1977) 279 Ore. 443 [568 P.2d 1382]); epilepsy (*Watson* v. *Franklin Finance* (Mo.App. 1976) 540 S.W.2d 186); or nervous disorder (*Pacific Mutual Life Ins. Co. of California* v. *Tetirick* (1938) 185 Okla. 37 [89 P.2d 774].)[7]

The above-cited decisions are in accord with California cases. ■ The courts in this state have adhered to the rule that the elements of a prima facie case for the tort of intentional infliction of emotional distress are that defendant's extreme or outrageous acts be made in reckless disregard of the fact that his or her conduct would cause plaintiff severe or extreme emotional distress. (*Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975]; *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 296 [131 Cal.Rptr. 547]; *Vargas* v. *Ruggiero* (1961) 197 Cal.App.2d 709, 721 [17 Cal.Rptr. 568]; *Bowden* v. *Spiegel, Inc., supra,* 96 Cal.App.2d at p. 795.)

■ Here, petitioner presented evidence raising questions of fact: that is, whether Los Robles' agent (1) acted in an unreasonable and outrageous manner; (2) acted in reckless disregard of petitioner's physical condition; (3) abused the special relationship that exists between hospital and patient.

The caller was not, as claimed by Los Robles, an ordinary creditor calling a typical debtor to request payment of a just debt. But rather, Los Robles' debt collector was in an apparent position of considerable power to affect petitioner's recovery.[8] Under such circumstances, it was arguably reasonable for petitioner to fear that failure to make immediate arrangements for payment would result in the withdrawal of treatment and in her being evicted from the medical facility. Inasmuch as petitioner at the time of the call claimed to be feeling the effects of surgery, a trier of fact may well draw the conclusion that she was in all probability vulnerable.[9] Moreover, it was

---

[7]See also, Annotation, Recovery for Debtor's Emotional Distress (1978) 87 A.L.R.3d 201.

[8]Restatement Second of Torts, section 46, comment e states: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. Thus an attempt to extort money by a threat of arrest may make the actor liable even where the arrest, or the threat alone, would not do so. In particular[,] police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position. Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous."

[9]We do not wish to imply that the evidence presented to the trial court is conclusive on this point. The statement of the nurse alleging that petitioner was in sound enough condition to receive the telephone call obviously raises a factual question as to petitioner's condition.

alleged that Los Robles had knowledge of petitioner's physical state, as well as the fact that she had recently been violently attacked with a machete.[10]

Los Robles did not dispute assertions made by petitioner that the caller, in a "rude and offensive" manner, persisted for a 20-30-minute period, demanding payment; that she neglected to advise petitioner of her eligibility for alternative means of payment (i.e., state aid, in the form of Medi-Cal, although this was part of her job); and continued making demand, notwithstanding the fact that petitioner advised the caller to contact her attorney in order to arrange payment.

Los Robles relies heavily upon *Girard* v. *Ball, supra,* 125 Cal.App.3d 772. *Girard* involved an attempt by an electrical contractor to collect payment from an attorney-real estate developer. The attorney-real estate developer sued for intentional infliction of emotional distress. The court, affirming summary judgment granted to the contractor, found that his collection efforts, consisting of two letters and a few telephone calls made at reasonable hours, were consistent with reasonable business practices.

In this instance, the circumstances are markedly different from those presented in *Girard.* Most significantly, the plaintiff in *Girard* did not claim to be in a fragile state of health at the time that defendant demanded payment. (See *ante,* fns. 6 and 10.) Moreover, it cannot be claimed that the creditor in *Girard* occupied an apparent position of considerable power to affect the debtor's well-being. (See *ante,* fn. 8.)

In short, there is a serious question as to whether the hospital's method of seeking payment, perhaps reasonable had it been attempted after petitioner had regained her health, was in fact reasonable in light of petitioner's alleged delicate physical and emotional state at the time of the call. Clearly, the resolution of this question should be through the consideration of live testimony presented to a trier of fact.

Let a peremptory writ of mandate issue commanding the respondent to vacate its order of February 24, 1983, granting partial summary judgment

---

[10]Restatement Second of Torts, section 46, comment f, illustration 12, provides an example which is nearly identical to the factual allegations set forth in petitioner's declaration: "A is in a hospital suffering from a heart illness and under medical orders that he shall have complete rest and quiet. B enters A's sick room for the purpose of trying to settle an insurance claim. B's insistence and boisterous conduct cause severe emotional distress, and A suffers a heart attack. B is subject to liability to A if he knows of A's condition, but is not liable if he does not have such knowledge."

in the case of Bundren v. Los Robles Regional Medical Center (Ventura Super. Ct. No. 73076), and enter a new order denying such motion.

Gilbert, J., and Abbe, J., concurred.