[No. B234636. Second Dist., Div. Four. Jan. 3, 2013.]

YUN HEE SO, Plaintiff and Appellant, v.
SOOK JA SHIN et al., Defendants and Respondents.

## COUNSEL

Henry M. Lee & Associates, Henry M. Lee and Robert Myong for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport; Taylor Blessey, Raymond L. Blessey and Barbara M. Reardon for Defendant and Respondent Sook Ja Shin.

Maranga•Morgenstern, Kenneth A. Maranga, Stephanie Charles; Greines, Martin, Stein & Richland, Timothy T. Coates and Carolyn Oill for Defendant and Respondent CHA-Hollywood Presbyterian Medical Center.

Law Offices of Jeffrey C. Bogert and Jeffrey C. Bogert for Defendant and Respondent HP Anesthesia Medical Group.

## OPINION

**SUZUKAWA, J.**—Plaintiff Yun Hee So (plaintiff) underwent a dilation and curettage procedure (D&C or procedure) in September 2008 following a miscarriage. She alleges that she was administered inadequate anesthesia and awoke during the procedure. When she later confronted the anesthesiologist, the anesthesiologist became angry, shoved a container filled with plaintiff's blood and tissue at her, and then urged plaintiff not to report the incident. Plaintiff sued the anesthesiologist and her medical group, as well as the hospital, asserting that the anesthesiologist's conduct constituted negligence, assault and battery, and intentional infliction of emotional distress, and that the hospital and medical group were liable to her directly and through the

doctrine of respondeat superior. The trial court sustained demurrers to the causes of action for assault and battery and intentional infliction of emotional distress; it later granted motions for judgment on the pleadings as to the cause of action for negligence. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *The Complaint*

Plaintiff filed the present action on August 11, 2010, and filed the operative first amended complaint (complaint) on January 6, 2011. The complaint alleges the following: Defendant Sook Ja Shin (Dr. Shin) is an anesthesiologist employed by defendant HP Anesthesia Medical Group (medical group). On September 30, 2008, plaintiff was admitted to defendant Hollywood Presbyterian Medical Center (hospital)[1] for a D&C following a miscarriage. Dr. Shin was the attending anesthesiologist. Plaintiff was administered insufficient anesthesia and awoke during the procedure, experiencing pain and discomfort.

After the procedure was over, plaintiff asked to speak to Dr. Shin, who came to the recovery room. Plaintiff asked Dr. Shin why she had awakened during the procedure. Dr. Shin became visibly upset and raised her voice. After hearing what plaintiff experienced, Dr. Shin admitted that plaintiff could have awakened during the procedure, but said that the suction sound and pain was nothing more than blood being suctioned from plaintiff's uterus. Dr. Shin was clearly angry that plaintiff had questioned her competence. Dr. Shin then left the room and returned with a container filled with blood and other materials. She was still visibly angry and spoke in a loud voice. She gestured with the container as if to hand it to plaintiff and then "stated words to the effect that Plaintiff could see that it was only blood which was suctioned therefore, there could not have been any pain. SHIN had come within a few inches of Plaintiff and motioned as though she was going to drop the container in Plaintiff's lap. When SHIN made those comments and movements, Plaintiff realized that the contents of the container were Plaintiff's blood and possible fragments of body parts of her dead baby. Plaintiff nearly fainted and screamed at SHIN to get away from her. [¶] . . . Realizing what she had done in her state of anger, SHIN came even closer to Plaintiff with the container still in her hand and tried to touch Plaintiff, and did touch Plaintiff's hands, arms and shoulders. Plaintiff[,] in a state of shock, kept screaming and crying for SHIN to get out of the room. SHIN left, but then later returned and asked Plaintiff to keep quiet about what had just happened and not to discuss the situation with the hospital. SHIN again touched

---

[1] The hospital's correct name is CHA-Hollywood Presbyterian Medical Center.

Plaintiff, grabbed Plaintiff's hand and told Plaintiff she should keep quiet about what had just happened." Subsequently, Dr. Shin offered to buy plaintiff dinner and "even bribed Plaintiff with a refund for the cost of the anesthesia, in exchange for Plaintiff's silence about the incident."

At the time of the incident, Shin was on the verge of being terminated by the medical group or the hospital. Shin feared that plaintiff might report her conduct to the medical group or the hospital, and therefore "lashed out at Plaintiff to try to prove to Plaintiff that SHIN had done nothing wrong. Plaintiff alleges that SHIN's anger, upset and resulting conduct towards Plaintiff was a result of SHIN being notified that she was too old and no longer competent, which in turn caused SHIN to act with anger towards Plaintiff." Plaintiff reported the incident to the hospital, but it did not take any remedial action. Moreover, the hospital and medical group "knew at all times that SHIN was unfit to administer health care services and employed her and continued to employ her in spite of their knowledge of SHIN's unfitness."

Plaintiff asserted three causes of action. The first cause of action, for negligence, alleges that Dr. Shin breached her duty of care to plaintiff, the incident did not constitute any form of health care, and "any reasonable person could foresee that showing Plaintiff a container filled with blood and other fragments, knowing Plaintiff had just finished a D&C procedure in the middle of which Plaintiff felt she had awoken and experienced the actual procedure being conducted, would cause Plaintiff to suffer emotional distress." It also alleges that the hospital and medical group are liable to plaintiff pursuant to two theories: (1) directly, because they hired and continued to employ Dr. Shin despite their knowledge that she was not fit to provide health care services, and (2) indirectly, because Shin was their agent/employee. The second cause of action, for intentional infliction of emotional distress, alleges that during the incident, Dr. Shin had actual knowledge that plaintiff was physically and emotionally distressed: Plaintiff had just been through a D&C, she had told Dr. Shin she had awakened during the procedure, and she was emotionally distraught and crying. Nonetheless, Dr. Shin reacted "with anger, rage and conscious disregard for Plaintiff's condition when SHIN brought in the container to try to prove to Plaintiff that Plaintiff was wrong and that SHIN was right." The third cause of action, for assault and battery, alleges that Dr. Shin acted with the intent to place plaintiff in fear of an imminent offensive contact. Among other things, Dr. Shin "walked towards Plaintiff with the container, motioned with her arms as though handing the container to Plaintiff, and acted as though she was about to place the container on Plaintiff. Plaintiff alleges that she never consented to nor agreed to permit SHIN to approach her, motion to her, or to touch her with the container filled with blood and fragments. . . . Plaintiff further alleges that after SHIN committed the assault and realizing what she had done, SHIN actually did touch Plaintiff on her hands, arms and shoulders telling Plaintiff not to report

what had just occurred." The second and third causes of action allege that the hospital and medical group knew of Dr. Shin's tortious acts but did nothing about them, and therefore "have ratified, approved and consented to SHIN's intentional conduct and should be held liable to plaintiff."

## II.   Demurrers to the First Amended Complaint

Dr. Shin and the hospital demurred to the second and third causes of action; the medical group joined the demurrers. As to the second cause of action (intentional infliction of emotional distress), Dr. Shin asserted that "[t]here are no facts alleged in the First Amended Complaint which can in any way be classified as extreme, outrageous, or outside the bounds of decency. In fact, if the facts as posed by Plaintiff are true, the most that can be said under any reasonable interpretation of the First Amended Complaint is that Dr. Shin was attempting to calm the patient subsequent to the surgery and to show her that the material removed from the plaintiff was blood and nothing more. This is further established by Plaintiff's claim that Dr. Shin attempted to touch her arms. This demonstrates that Dr. Shin was attempting to soothe the patient and did not have the requisite intent to inflict emotional distress." Further, Dr. Shin said, plaintiff pled no facts showing that she actually suffered severe emotional distress. Therefore, "because Plaintiff failed to plead facts establishing that this Defendant engaged in anything that approached 'outrageous conduct,' or that Plaintiff suffered 'severe emotional distress,' the Second Cause of Action is defective and this demurrer should be sustained." As to the third cause of action (assault and battery), Dr. Shin contended that touching plaintiff was an essential part of providing the surgery to which plaintiff consented. Further, Dr. Shin's subsequent attempts to comfort her patient by "approaching the plaintiff to show her what was suctioned from her for the purposes of reassurance can hardly be argued to establish the requisite intent for a harmful and offensive contact; therefore, it is not an assault."

The hospital also demurred to the second and third causes of action. The hospital contended that the second cause of action failed to plead extreme or outrageous conduct because "[t]he best that can be said under any reasonable interpretation of the pleading is that SHIN was trying to calm the plaintiff down by showing her the products of conception and soothing her with a physician's healing touch." Further, the hospital asserted that Dr. Shin was not its agent and plaintiff failed to plead specific facts alleging the elements of the cause of action—i.e., "the who, where, what and why necessary to state either an intentional cause of action or ratification thereof." As to the third cause of action, the hospital contended that plaintiff consented to the alleged offensive touching and, thus, no battery existed. It asserted: "A touching of the person is a necessary component of performing a D&C

procedure and, especially, when trying to soothe a distraught patient, that touching cannot be considered to be an assault and battery. Furthermore, the approaching of the plaintiff with the products of conception in order to assure her that body parts of a fetus were not suctioned out of the patient during the procedure can hardly be said to be an assault."

The trial court sustained the demurrers. The minute order said: "Re Cause of Action 2 [(Intentional Infliction of Emotional Distress)]: Plaintiff . . . fails to allege facts sufficient to support the element of 'outrageous conduct.' Re Cause of Action 3 [(Assault & Battery)]: The facts alleged [are] insufficient to show either: a) that any touching by defendant Shin was unconsented to (i.e.[,] beyond the scope of the subject medical treatment); or b) a basis for vicarious liability as against moving party defendant. Plaintiff alleges that Shin was employed by defendant HP Anesthesia rather than moving party. There are still no facts alleged to show authorization or ratification of Shin's alleged conduct on the part of an officer, director or managing agent of moving party."

### III.   *Motions for Judgment on the Pleadings*

The hospital and Dr. Shin moved for judgment on the pleadings on April 15, 2011; the medical group joined in the motions. Defendants contended that although the first cause of action purported to state a claim for *ordinary* negligence, it in fact alleged professional negligence because the alleged injuries occurred during the performance of *professional* services. Thus, the claim was subject to the one-year statute of limitations set forth in Code of Civil Procedure section 340.5.[2] Because plaintiff claimed to have been harmed on September 30, 2008, but did not file suit until August 2010, the suit was time-barred.

Plaintiff opposed the motions. She urged that the statute of limitations for medical malpractice did not apply because her claim did not concern the provision of medical care. Further, even if section 340.5 did apply, the statute of limitations would not begin to run until the patient-physician relationship was terminated, and there was no evidence before the court as to when that relationship had terminated or when the statute of limitations commenced to run.

The court granted the motion, stating as follows: "Plaintiff was admitted to the hospital and had the medical procedure (D&C) on or about September 30, 2008. The applicable statute of limitations under MICRA [(Medical Injury Compensation Reform Act)] is CCP 340.5 which provides that an action

---

[2] All further undesignated statutory references are to the Code of Civil Procedure.

against a healthcare provider must be filed within three years after the date of injury, 'or one year after plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever comes first.' The complaint in this action was filed on 8/11/10, almost two years after plaintiff discovered or should have discovered the injury. Plaintiff argues that this is not a . . . cause of action for negligence of a healthcare provider, but rather some kind of general negligence action and therefore CCP 340.5 does not apply. The court disagrees. The primary consideration for the court is whether the alleged negligent act or omission occurred in the 'rendering of professional services.' *Bellamy v. Appellate Department* (1996) 50 Cal.App.4th 797, 808 [57 Cal.Rptr.2d 894]. After three versions of the complaint plaintiff has laid out in great detail the factual circumstances supporting her claim, [e.g.,] [s]he awakened during the D&C procedure and suffered as a result of seeing and hearing the procedure, and [defendant] came into the room with a jar which contained blood and possibly body parts which were the result of the procedure. There is no question that these alleged acts occurred in the rendering of professional services. Plaintiff alleges the conclusion that i[t] was not 'in the course of rendering of professional services,' but the court is not bound to accept as a fact the legal conclusion of plaintiff when the detailed facts alleged established the contrary.

"Plaintiff also alleges that defendant hospital is responsible for hiring and retaining an incompetent doctor and for a nurse's failure to come to plaintiff's aid, and therefore these are separate duties outside of the rendering of professional services. 'The competent selection and review of medical staff is precisely the type of professional service a hospital is licensed and expected to provide . . . ,' and this allegation comes within MICRA as well. See *Bell v. Sharp Cabrillo Hospital* (1989) 212 Cal.App.3d 1034, 1050–51 [260 Cal.Rptr. 886].

"This latter argument also goes to the alleged liability of defendant HP Anesthesia Medical Group. The Motion [for] Joinder is granted, and for the same reasons stated above, the motion is granted as to this defendant." (Italics added.)

The trial court entered judgment for Dr. Shin, the hospital, and the medical group on June 1, 2011; it entered a subsequent judgment for Dr. Shin on June 13, 2011. Plaintiff timely appealed from the judgment.

## STANDARD OF REVIEW

"A demurrer tests the legal sufficiency of the factual allegations in a complaint. We independently review the sustaining of a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of

action or discloses a complete defense. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) We construe the pleading in a reasonable manner and read the allegations in context. (*Ibid.*)" (*Villari v. Mozilo* (2012) 208 Cal.App.4th 1470, 1477 [146 Cal.Rptr.3d 556].)

"A motion for judgment on the pleadings is analogous to a general demurrer. (*Ludgate*[ *Ins. Co. v. Lockheed Martin Corp.* (2000)] 82 Cal.App.4th [592,] 602 [98 Cal.Rptr.2d 277].) Like a general demurrer, it tests the sufficiency of the complaint. (*108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136 Cal.App.4th 186, 193 [38 Cal.Rptr.3d 589].) The scope of our review of a judgment on the pleadings is de novo, and we determine whether the complaint states a valid cause of action. (*Ludgate*, at p. 602.) In so doing, we accept as true the factual allegations the plaintiff makes and give them a liberal construction." (*Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103, 1111 [141 Cal.Rptr.3d 167], fn. omitted.)

## DISCUSSION

### I. *Judgment on the Pleadings—Negligence Claim*

■ The limitations period for a cause of action for ordinary negligence is two years. (§§ 335, 335.1.)[3] The limitations period for a cause of action for professional negligence against a health care provider is under some circumstances shorter—"one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury." (§ 340.5.)

There is no dispute that plaintiff discovered the alleged negligence the day it happened—September 30, 2008—or that she filed the present action on August 11, 2010, nearly two years later. The issue before us is whether plaintiff's claim is for "professional" negligence, and hence is time-barred, or "ordinary" negligence, and thus is timely. We consider this issue below.

#### A. *Section 340.5*

Section 340.5 was enacted as part of MICRA. (See *Preferred Risk Mutual Ins. Co. v. Reiswig* (1999) 21 Cal.4th 208, 214–215 [87 Cal.Rptr.2d 187,

---

[3] These sections provide: "The periods prescribed for the commencement of actions other than for the recovery of real property, are as follows . . . ." "Within two years: An action for assault, battery, or injury to, or for the death of, an individual . . . by the wrongful act or neglect of another." (§§ 335, 335.1.)

980 P.2d 895].) It provides that the statute of limitations for a cause of action against a health care provider for medical negligence is as follows: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first."

For purposes of section 340.5, a "health care provider" is "any person licensed or certified pursuant to [licensing statutes for health care providers]; and any clinic, health dispensary, or health facility, licensed pursuant to [licensing statutes for health care facilities]." (§ 340.5, subd. (1).) "Professional negligence" is "a negligent act or omission to act by a health care provider *in the rendering of professional services*, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (§ 340.5, subd. (2), italics added.)

█ Courts have broadly interpreted "in the rendering of professional services," concluding that a negligent act that occurs in the rendering of services for which the health care provider *is licensed is* professional negligence. For example, in *Murillo v. Good Samaritan Hospital* (1979) 99 Cal.App.3d 50 [160 Cal.Rptr. 33] (*Murillo*), the plaintiff sued after she fell out of bed while being treated for shingles at the defendant hospital. The plaintiff alleged that the hospital staff acted negligently by failing to raise the side rails of her hospital bed at night and the hospital's negligence was "professional negligence" within the meaning of section 340.5. (99 Cal.App.3d at p. 53.) The hospital disagreed, urging that the alleged negligent act—failure to raise the bedrails—was ordinary negligence, and thus that a shorter statute of limitations applied. (*Ibid.*)[4]

█ The Court of Appeal held the complaint alleged professional negligence, explaining that under section 340.5, "the test is not whether the situation calls for a high or a low level of skill, or whether a high or low level of skill was actually employed, but rather . . . whether the negligent act occurred in the rendering of services for which the health care provider is licensed." (*Murillo, supra,* 99 Cal.App.3d at p. 57.) Providing 24-hour inpatient care for a patient with shingles was clearly within the scope of services for which the hospital was licensed: █ "In providing inpatient care, a hospital has a duty to 'exercise such reasonable care in treating a patient as his known condition may require.' [Citation.] Otherwise stated, a

---

[4] When *Murillo* was decided, the statute of limitations for ordinary negligence was one year. (*Murillo, supra,* 99 Cal.App.3d at p. 53.)

hospital has a duty 'to use reasonable care and diligence in safeguarding a patient committed to its charge [citations] and such care and diligence are measured by the capacity of the patient to care for himself.' " (*Id.* at p. 55.) Thus, the court concluded, because the question raised by the complaint— whether it was negligent to leave the bedrails down during the night while plaintiff was asleep—concerned the hospital's duties to recognize the condition of patients under its care and to take appropriate measures for their safety, the issue "is squarely one of professional negligence [citation] and section 340.5 governs the running of the statute of limitations." (*Id.* at p. 56.)

The court reached a similar result in *Canister v. Emergency Ambulance Service, Inc.* (2008) 160 Cal.App.4th 388 [72 Cal.Rptr.3d 792] (*Canister*). There, the plaintiff, a police officer, was injured when an ambulance in which he was transporting an arrestee hit a curb. The plaintiff alleged that the ambulance had been negligently driven and the EMT's (emergency medical technicians) had not told him seatbelts were available. (*Id.* at pp. 393–394.) He urged, however, that the EMT's negligence was not "professional negligence" because EMT's were licensed to provide emergency medical services, not transportation. (*Id.* at p. 405.)

The Court of Appeal disagreed, holding that negligent operation of an ambulance is professional negligence within the meaning of the statute. It said: "We hold, as a matter of law, that the act of operating an ambulance to transport a patient to or from a medical facility is encompassed within the term 'professional negligence.' [¶] The MICRA statutes define ' "professional negligence" ' as that negligence that occurs while the health care provider is providing services that are 'within the scope of services for which the provider is licensed.' [Citations.] The relevant test is not the degree of skill required, but whether the negligence occurred in the rendering of services for which a provider is licensed. [Citations.] Although the act of operating an ambulance may be performed by someone having no special knowledge, skill or care as a member of the medical profession, this does not mean the employees here in question were not acting as health care providers in transporting the patient to a medical facility." (*Canister, supra,* 160 Cal.App.4th at p. 404.)

The court continued: "Rendering ambulance services is like the type of services described in *Bellamy v. Appellate Department, supra,* 50 Cal.App.4th at page 808, in which the court observed: '[A]n X-ray technician may perform a variety of tasks, such as assisting the patient onto the table, manipulating the table into one or more desired positions, instructing the patient to move from one position to another, activating the X-ray machine, removing the photographic plates, assisting the patient from the table, etc. Some of those tasks may require a high degree of skill and judgment, but

others do not. Each, however, is an integral part of the professional service being rendered.' An EMT similarly performs a number of tasks in transporting a patient to a hospital, any one of which might result in a claim of negligence. [¶] Viewing the undisputed facts in the present case, we determine as a matter of law that the services rendered by the EMT-I's in this action were directly related to the manner in which professional services were provided. [Citation.] The accident occurred while EAS's employees were transporting the patient from one hospital to another, activities for which the ambulance driver and attendant were licensed. An integral part of the duties of an EMT includes transporting patients and driving or operating an ambulance." (*Canister, supra,* 160 Cal.App.4th at p. 407.)

Notwithstanding the broad interpretation generally given the phrase "in the rendering of professional services," this court concluded in *Atienza v. Taub* (1987) 194 Cal.App.3d 388 [239 Cal.Rptr. 454] (*Atienza*) that a physician's sexual relationship with his patient did not come within that statutory language. There, the plaintiff consulted with the defendant physician concerning an inflamed vein. During the course of treatment, the defendant " 'seduced [appellant] into having sexual relations and an affair' " that lasted more than a year. (*Id.* at p. 390.) After the affair ended, the plaintiff sued the defendant for professional negligence, alleging that by initiating a sexual relationship with her while she was under his care, the defendant " 'failed to adequately care for and treat the [plaintiff] by virtue of abusing her psychologically while purportedly treating her physically.' " (*Ibid.*)

The trial court sustained a demurrer to the complaint, concluding that the plaintiff had not stated a claim for professional negligence. (*Atienza, supra,* 194 Cal.App.3d at p. 391.) We affirmed: "[A]n action for the professional negligence of a physician arises out of the breach of the duty of care owed to the patient by the physician *within* the scope of the patient-physician relationship. [¶] Appellant maintains that respondent's initiation of a sexual relationship with her breached the duty of care which he owed her as a physician. . . . [W]hile a physician's sexual misconduct can be the basis of a malpractice action, these authorities are distinguishable from the instant case because the sexual relationship in those cases was initiated by the physician purportedly in furtherance of his treatment of the patient. This was not the situation in the case before us. [¶] . . . [¶]

"The relevant authorities . . . agree that a physician who induces a patient to enter into sexual relations is liable for professional negligence only if the physician engaged in the sexual conduct on the pretext that it was a necessary part of the treatment for which the patient has sought out the physician. In the case at bar, however, appellant does not make this allegation. Instead, appellant seeks to combine the care given to her by respondent for her

phlebitis and the emotionally destructive effect of her romantic and sexual involvement with him under the rubric of 'treatment' simply because the two things took place over the same period of time. Appellant does not allege that she was induced to have sexual relations with respondent in furtherance of her treatment. Essentially, appellant complains that she had an unhappy affair with a man who happened to be her doctor. This is plainly insufficient to make out a cause of action for professional negligence under any of the theories presented." (*Atienza, supra,* 194 Cal.App.3d at pp. 392–394, fns. omitted; see *Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 192 [10 Cal.Rptr.2d 208, 832 P.2d 924] (*Central Pathology*) ["[A] cause of action against a health care provider for battery predicated on treatment exceeding or different from that to which a plaintiff consented is governed by section 425.13 because the injury arose out of the manner in which professional services are provided. By contrast, a cause of action against a health care provider for sexual battery would not, in most instances, fall within the statute because the defendant's conduct would not be directly related to the manner in which professional services were rendered."].)

### B. *Dr. Shin's Alleged Negligence and the Hospital's Alleged Respondeat Superior Liability*

■ It is undisputed that the conduct on which plaintiff bases her negligence claims against Dr. Shin, as well as her respondeat superior claims against the hospital, occurred immediately after plaintiff underwent surgery, while she was still in the recovery room. Further, it seems to us obvious, as Dr. Shin asserts, that an anesthesiologist's responsibility to her patient does not necessarily end when the patient leaves the operating room—the anesthesiologist may have a continuing responsibility to monitor the anesthesia's postoperative effects on the patient. Thus, an anesthesiologist's presence in the recovery room with a patient may be, as Dr. Shin asserts, "consistent with the role of an anesthesiologist in aiding the patient in recovering from anesthesia." The question for us is whether it is necessarily so. In other words, because an anesthesiologist's postsurgical contact with a patient *may* be for the purpose of rendering professional services, must we conclude that such contact *necessarily* is for that purpose?

■ We believe the answer is no. *Atienza* teaches that misconduct by a physician is not necessarily professional negligence—even where, as there, the misconduct occurs "over the same period of time" that medical services are provided. (*Atienza, supra,* 194 Cal.App.3d at p. 393.) Rather, professional negligence is only that negligent conduct engaged in *for the purpose of* (or the purported purpose of) delivering health care to a patient—or, in the words of our Supreme Court in *Central Pathology,* conduct "directly related to the

professional services provided by a health care provider *acting in its capacity as such*" and that "is an ordinary and usual part of medical professional services." (*Central Pathology, supra,* 3 Cal.4th at pp. 191, 193, italics added.) Stated simply, negligent actions undertaken by a health care provider for the purpose of delivering medical care to a patient constitute professional negligence; tortious actions undertaken for a different purpose—in *Atienza,* for the physician's sexual gratification—are not.

■ In the present case, plaintiff alleges that Dr. Shin engaged in the alleged tortious conduct for the purpose of persuading plaintiff not to report to the hospital or medical group that plaintiff had awakened during surgery. In other words, plaintiff alleges that Dr. Shin acted for her own benefit, to forestall an embarrassing report that might damage her professional reputation—*not* for the benefit of her patient. As pled, therefore, the alleged negligence was not undertaken "in the rendering of professional services," and thus it does not constitute professional negligence within the meaning of section 340.5.

*Murillo* and *Canister* do not suggest a different result. In those cases, the issue before the courts was whether negligent acts that did not involve medical knowledge or skill, such as raising a patient's bedrails or driving an ambulance, could constitute professional negligence. The courts did not consider the issue raised here—whether negligent conduct allegedly undertaken by a doctor for the doctor's own benefit, rather than for a legitimate medical reason, constitutes *professional* negligence.

Dr. Shin contends that under the multitude of cases broadly construing section 340.5, the complaint's allegations must be construed as professional negligence because they concern her postoperative discussions with a patient as the patient was recovering from anesthesia. We do not agree. Although, as we have said, we believe that Dr. Shin could have legitimately rendered professional services to plaintiff postsurgery, that does not mean that we must necessarily construe any postsurgical contact with plaintiff in that light. Nor are we persuaded that any negligence was necessarily *professional* negligence because "but for receiving Dr. Shin's professional services—the administration of anesthesia—the events detailed in the complaint would never have occurred." If that were the test, almost any interaction between doctor and patient—even such actions as placing threatening phone calls to a patient about unpaid medical bills, or a sexual assault—could be classified as professional negligence. We do not so conclude. The trial court therefore erred by granting judgment on the pleadings for Dr. Shin.

The trial court also erred by granting judgment on the pleadings as to the respondeat superior claim against the hospital and medical group. Because we

cannot conclude as a matter of law that the hospital and medical group are not liable under a respondeat superior theory, judgment should not have been granted for these defendants.

## C. *The Hospital's Alleged Direct Negligence*

■ We reach a different result with regard to plaintiff's claims of direct negligence against the hospital. There is no dispute that the hospital is a health care provider, and providing inpatient care for a postsurgical patient is "clearly 'within the scope of services for which [a] hospital is licensed.' (See Health & Saf. Code, § 1250.) In providing inpatient care, a hospital has a duty to 'exercise such reasonable care in treating a patient as [her] known condition may require.' (*Valentin* v. *La Societe Francaise* (1946) 76 Cal.App.2d 1, 6 [172 P.2d 359].) Otherwise stated, a hospital has a duty 'to use reasonable care and diligence in safeguarding a patient committed to its charge [citations] and such care and diligence are measured by the capacity of the patient to care for [herself].' (*Thomas* v. *Seaside Memorial Hospital* (1947) 80 Cal.App.2d 841, 847 [183 P.2d 288].)" (*Murillo, supra,* 99 Cal.App.3d at p. 55.)

In the present case, the complaint alleges that the hospital was "directly negligent in hiring and continu[ing to employ] SHIN in spite of [its] knowledge of her inability to provide health care services. Plaintiff alleges that [the hospital] owed a specific duty to make sure that the persons whom they employed performed health care services in a competent manner and that it was reasonably foreseeable that by hiring and continu[ing] to employ Defendant SHIN in spite of their knowledge of her unfitness to provide health care services, that persons like Plaintiff would suffer harm." In other words, plaintiff premises her direct negligence claim on the hospital's alleged failure to properly screen Dr. Shin before engaging her and to properly supervise her after engaging her. Since hiring and supervising medical personnel, as well as safeguarding incapacitated patients, are clearly within the scope of services for which the hospital is licensed, its alleged failure to do so necessarily states a claim for professional negligence. Accordingly, plaintiff cannot pursue a claim of direct negligence against the hospital.

## II. *Demurrer to Cause of Action for Assault and Battery*

■ Plaintiff's third cause of action alleges assault and battery. The essential elements of a cause of action for assault are: (1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3)

plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm. (CACI No. 1301; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1603–1604 [146 Cal.Rptr.3d 585].) ▇ The essential elements of a cause of action for battery are: (1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching. (CACI No. 1300; see *Kaplan v. Mamelak* (2008) 162 Cal.App.4th 637, 645 [75 Cal.Rptr.3d 861] (*Kaplan*).)

▇ A medical battery occurs where "a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained . . . ." (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 239 [104 Cal.Rptr. 505, 502 P.2d 1]; see *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1495–1496 [21 Cal.Rptr.3d 36].) In contrast, "when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence." (*Cobbs v. Grant, supra*, at pp. 240–241.)

The only issue before the court on demurrer—and the sole ground on which the trial court relied in sustaining the demurrers—was whether plaintiff consented to the actions on which she based her assault and battery claim. According to Dr. Shin, the trial court correctly sustained the demurrer to the cause of action for assault and battery because plaintiff's consent to the D&C "encompassed *all* anesthesia services by Dr. Shin—both during and after the D&C." Further, she says, "it is not required that a physician obtain the patient's consent to treatment more than once. [Citation.] It sufficed that plaintiff was fully apprised of the risks of anesthesia and available alternatives, and that she consented to anesthesia and post-anesthesia care by Dr. Shin. Dr. Shin did not have a duty to seek that consent for a second time during the recovery process." The hospital contends similarly, urging that a patient's consent to a medical procedure "must necessarily encompass *all* the steps involved in rendering care related to the procedure, both before and after the procedure, whether those steps require special skill or not."

We do not agree. Although, as we have said, consent to surgery necessarily encompasses consent to postoperative care, not all postoperative *contact* between doctor and patient constitutes *care*. The question of the nature of the contact between plaintiff and Dr. Shin, and whether that contact was within the scope of plaintiff's consent, is a factual question for a finder of fact to decide.

The court addressed an analogous issue in *Kaplan, supra*, 162 Cal.App.4th at page 647. There, the plaintiff suffered pain from a herniated disk in his spine and sought treatment from the defendant, a neurosurgeon. The defendant operated on the plaintiff's spine, but "mistook the disks causing appellant's pain and their place on Kaplan's spinal column. He thus operated on the disks between the sixth and seventh (T6-7) and seventh and eighth thoracic vertebrae (T7-8), instead of the targeted—and correct—T8-9." (*Id.* at pp. 639–640.) The plaintiff sued for battery, among other torts; the defendant demurred, asserting that because the plaintiff consented to spinal surgery, the surgery on the incorrect disks might constitute negligence, but not battery. The trial court sustained the demurrer. (*Id.* at p. 645.)

The Court of Appeal reversed. It explained: "In the absence of any definitive case law establishing whether operating on the wrong disk within inches of the correct disk is a 'substantially different procedure,' we conclude the matter is a factual question for a finder of fact to decide and, at least in this instance, not one capable of being decided on demurrer. . . . Accordingly, the trial court erred in sustaining respondent's demurrer to appellant's cause of action for battery." (*Kaplan, supra*, 162 Cal.App.4th at p. 647.)

The present case is analogous. Here, the complaint alleges that Dr. Shin interacted with plaintiff postoperatively to defend her professional competence and to attempt to persuade plaintiff not to report that plaintiff had awoken during surgery—*not* to provide plaintiff with medical care.[5] The complaint further alleges that plaintiff did not consent to this interaction: "SHIN's menacing conduct, motions to bring the blood container closer to

---

[5] It alleges as follows: "After hearing Plaintiff's explanation as to what she experienced, SHIN admitted that Plaintiff could have awoken during the middle of the procedure; however, SHIN loudly stated that the suction sound and pain was nothing more than the blood being suctioned from Plaintiff's uterus, claiming that even if she had awoken, Plaintiff could not have experienced any pain. Based on her conduct, facial expressions and loud voice, SHIN was clearly angry that Plaintiff had questioned SHIN's competence. To Plaintiff's surprise, SHIN then left the room and returned with a container containing what appeared to be blood and other materials. [¶] . . . Defendant SHIN[,] who was still visibly angry and still talking in a loud voice, approached Plaintiff and made movements towards Plaintiff, like walking towards Plaintiff's side, gesturing with the container, as though SHIN was going to hand the container to Plaintiff. . . . SHIN had come within a few inches of Plaintiff and motioned as though she was going to drop the container in Plaintiff's lap. When SHIN made those comments and movements, Plaintiff realized that the contents of the container were Plaintiff's blood and possible fragments of body parts of her dead baby. Plaintiff nearly fainted and screamed at SHIN to get away from her. [¶] . . . Realizing what she had done in her state of anger, SHIN came even closer to Plaintiff with the container still in her hand and tried to touch Plaintiff, and did touch Plaintiff's hands, arms and shoulders. Plaintiff[,] in a state of shock, kept screaming and crying for SHIN to get out of the room. SHIN left, but then later returned and asked Plaintiff to keep quiet about what had just happened and not to discuss the situation with the hospital. SHIN again touched Plaintiff, grabbed Plaintiff's hand and told Plaintiff she should keep quiet about what had just happened."

Plaintiff's face, and her subsequent touching of Plaintiff's hands, arms and shoulder [were not] consented to, either expressly or impliedly, as Plaintiff expressly told SHIN to get away from her." As in *Kaplan*, whether this alleged conduct was within the scope of plaintiff's consent "is a factual question for a finder of fact to decide and, at least in this instance, not one capable of being decided on demurrer." (*Kaplan, supra*, 162 Cal.App.4th at p. 647.)

III. *Demurrer to Cause of Action for Intentional Infliction of Emotional Distress*

■ The third cause of action alleges intentional infliction of emotional distress. "The elements of a cause of action for intentional infliction of emotional distress are (1) the defendant engages in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, emotional distress; (2) the plaintiff suffers extreme or severe emotional distress; and (3) the defendant's extreme and outrageous conduct was the actual and proximate cause of the plaintiff's extreme or severe emotional distress. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001 [25 Cal.Rptr.2d 550, 863 P.2d 795].) '[O]utrageous conduct' is conduct that is intentional or reckless and so extreme as to exceed all bounds of decency in a civilized community. (*Ibid.*) The defendant's conduct must be directed to the plaintiff, but malicious or evil purpose is not essential to liability. (*Ibid.*)" (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 203 [147 Cal.Rptr.3d 41] (*Ragland*).)

Defendants demurred to the cause of action for intentional infliction of emotional distress, urging that none of the conduct alleged in the complaint properly could be characterized as extreme, outrageous, or outside the bounds of decency. Defendants repeat these contentions here, suggesting that the conduct alleged in the complaint "does not approach the level of outrageousness required for the purposes of stating a claim for [intentional infliction of emotional distress]. The gravamen of plaintiff's [intentional infliction of emotional distress] claim is that Dr. Shin acted with anger and hostility, but these elements do not constitute 'outrageous conduct.' [Citation.] To the contrary, the only reasonable inference from the facts alleged in the complaint is that Dr. Shin was attempting to calm plaintiff."

■ We do not agree. "There is no bright line standard for judging outrageous conduct and ' ". . . its generality hazards a case-by-case appraisal of conduct filtered through the prism of the appraiser's values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical . . . ." [Citation.]' (*KOVR-TV[, Inc. v. Superior Court* (1995)] 31 Cal.App.4th [1023,] 1028 [37 Cal.Rptr.2d 431].)"

(*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 494 [76 Cal.Rptr.2d 540].) Thus, whether conduct is "outrageous" is usually a question of fact. (*Ragland, supra*, 209 Cal.App.4th at p. 204; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1045 [90 Cal.Rptr.3d 453].)

The court applied these principles to hold that summary judgment was improperly granted for the defendant in *Bundren v. Superior Court* (1983) 145 Cal.App.3d 784 [193 Cal.Rptr. 671] (*Bundren*). There, the plaintiff alleged that the day after she underwent an elective surgery at Los Robles Regional Medical Center (medical center), the medical center's business office called her to say that her insurance carrier had denied coverage and to ask how the plaintiff intended to pay her medical bill. The caller's questioning lasted for 20 to 30 minutes and was "abusive, rude and inconsiderate." (*Id.* at p. 788.) The plaintiff alleged that she became extremely upset and believed that she would be discharged if she did not make a commitment towards paying the medical bill. (*Ibid.*)

The medical center moved for partial summary judgment, urging that its collection methods were consistent with common business practices. (*Bundren, supra*, 145 Cal.App.3d at pp. 788–789.) The Court of Appeal reversed the grant of partial summary judgment, holding that there were triable issues of fact as to whether the medical center acted in an unreasonable and outrageous manner. It explained: "The caller was not, as claimed by Los Robles, an ordinary creditor calling a typical debtor to request payment of a just debt. But rather, Los Robles' debt collector was in an apparent position of considerable power to affect petitioner's recovery. Under such circumstances, it was arguably reasonable for petitioner to fear that failure to make immediate arrangements for payment would result in the withdrawal of treatment and in her being evicted from the medical facility. Inasmuch as petitioner at the time of the call claimed to be feeling the effects of surgery, a trier of fact may well draw the conclusion that she was in all probability vulnerable. Moreover, it was alleged that Los Robles had knowledge of petitioner's physical state, as well as the fact that she had recently been violently attacked with a machete. [¶] . . . [¶] In short, there is a serious question as to whether the hospital's method of seeking payment, perhaps reasonable had it been attempted after petitioner had regained her health, was in fact reasonable in light of petitioner's alleged delicate physical and emotional state at the time of the call. Clearly, the resolution of this question should be through the consideration of live testimony presented to a trier of fact." (*Id.* at pp. 791–792, fns. omitted.)

The present case is analogous. As in *Bundren*, plaintiff here had recently undergone surgery; indeed, in the present case plaintiff was not only still in the hospital—she was in the recovery room. Further, plaintiff had recently

miscarried, had required a procedure to remove the dead fetus from her uterus, and claimed to have awakened during the procedure. Under these circumstances, a trier of fact "may well draw the conclusion that she was in all probability vulnerable" (*Bundren, supra,* 145 Cal.App.3d at p. 791) and, as in *Bundren,* that Dr. Shin unquestionably knew of plaintiff's physical state. Moreover, a reasonable juror could conclude that forcing a patient who had recently miscarried to look at what she believed to be her dismembered fetus was extreme and outrageous. Accordingly, the trial court erred in concluding that Dr. Shin's conduct was not extreme or outrageous as a matter of law.

## DISPOSITION

The judgment of dismissal is reversed. Plaintiff shall recover her costs on appeal.

Epstein, P. J., and Manella, J., concurred.

A petition for a rehearing was denied January 28, 2013, and the opinion was modified to read as printed above.