Filed 6/19/14  Safeway v. Super. Ct. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| SAFEWAY, INC.,<br><br>　　Petitioner,<br><br>v.<br><br>SUPERIOR COURT FOR THE COUNTY OF ALAMEDA,<br><br>　　Respondent;<br>KATHLEEN HARDIN and  DANE HARDIN,<br><br>　　Real Parties in Interest. | A141505<br><br>(Alameda County<br>Super. Ct. No. RG11600291) |
| PALO ALTO FOUNDATION MEDICAL GROUP, INC.,<br><br>　　Petitioner,<br>v.<br>SUPERIOR COURT FOR THE COUNTY OF ALAMEDA,<br><br>　　Respondent;<br>KATHLEEN HARDIN and  DANE HARDIN,<br><br>　　Real Parties in Interest. | A141513<br><br>(Alameda County<br>Super. Ct. No. RG11600291) |
| SHARON S. JAMIESON, M.D.,<br><br>　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>　　Respondent; | A141514<br><br>(Alameda County<br>Super. Ct. No. RG11600291) |

KATHLEEN HARDIN and DANE HARDIN,

      Real Parties in Interest.

Due to side effects of a drug prescribed by her physician, real party Kathleen Hardin sustained severe and debilitating injuries. She alleged she was not warned of these potential, serious side effects of the medication by her doctor, petitioner Sharon S. Jamieson, M.D., the medical practice that employs Jamieson—petitioner Palo Alto Foundation Medical Group, Inc. [Medical Group], or by the dispensing pharmacy, petitioner Safeway, Inc. Hardin, together with her husband, real party Dane Hardin (Dane),[1] sued various defendants, including petitioners, for negligence and loss of consortium. Petitioners brought separate motions for summary judgment, based on their contention that the complaint was untimely. The superior court denied Jamieson's and the Medical Group's summary judgment motions, finding there were triable issues of fact regarding the delayed discovery by Hardin of the cause of her injuries. The court also denied Safeway's motion for summary judgment, in part, due to Hardin's delayed discovery of the cause of her injuries and, in part, because it was not established that in all relevant respects, Safeway was a health care provider pursuant to the Medical Injury Compensation Reform Act [MICRA] entitled to protection of the statute of limitations for professional negligence.

Petitioners each filed timely petitions for writ of mandate in this court. For purposes of this decision only, we consolidate these petitions because they are based on a common set of facts. There are no material disputed facts concerning the applicability of the statute of limitations. We conclude that Hardin and her

---

[1]For ease of reference and to avoid confusion, we will refer to Mr. Hardin by his first name. We intend no disrespect.

husband knew her injuries were caused by her adverse reaction to medication in June 2010. Her complaint was not filed within one year of her discovery and is barred by Code of Civil Procedure section 340.5. We also conclude that Safeway was acting as a health care provider in the events alleged in Hardin's complaint and entitled to the limitations period in section 340.5. We direct the superior court to vacate its orders denying summary judgment and to issue new and different orders granting the summary judgment motions in favor of each petitioner.

### FACTUAL AND PROCEDURAL BACKGROUND

Hardin was generally under the care of Jamieson, her primary care physician, from sometime in 2002 through June 29, 2011. On March 31, 2010 Jamieson prescribed a new medication, Lamictal, for Hardin without discussing any of the potential risks or side effects associated with the drug. Hardin filled the prescription with Lamotrigine, the generic form of Lamictal, at a Safeway pharmacy in Santa Cruz. She received a one-page computer print-out at the pharmacy which discussed some possible side effects of the drug such as allergic reactions. The print-out did not mention Stevens-Johnson Syndrome (SJS), Toxic Epidermal Necrolysis (TENs) or other serious or life-threatening risks. The pharmacist gave Hardin no verbal or supplemental warnings other than the computer print-out. Hardin began taking 25 milligrams per day on April 2, 2010, and gradually increased the dosage. On April 21, 2010, Jamieson wrote her a new prescription for 100-milligram tablets. When Hardin filled this second prescription she received from Safeway an identical print-out concerning Lamotrigine that she had previously received. Again she received no verbal or supplemental warnings.

On April 25 Hardin began to experience a sense of malaise. The next day she called her work to inform them that she was not well. She has no further memories of what happened until she awoke in the hospital in June 2010. The day

3

after Hardin remembers calling work, her husband, Dane, took her to urgent care in Santa Cruz because her condition seemed to be deteriorating. She had small blotches on her face and chest, and her eyes were bloodshot. The next day she was hospitalized at Dominican Hospital, where she went into a coma. She was diagnosed with SJS, a condition that causes internal and external burn-like rashes. On April 28, 2010 she was transferred to the burn unit of the Santa Clara Valley Medical Center, where she was in a coma from April 28 until sometime in June 2010, while SJS and TENs[2] caused organ failure. On July 16, 2010, when discharged from the hospital in Santa Clara, Hardin still had open wounds and was virtually blind, able only to sense light and dark.

Hardin testified that once she awoke from the coma she was told in June 2010 that she had SJS and TENs and that those conditions were caused by Lamotrigine. She did not know, however, whether the conditions were common complications from Lamotrigine or had been reported in the literature. Dane, on the other hand, had researched the side effects of Lamotrigine and learned on April 27, 2010, that SJS was a potential side effect, after his wife was seen in the Urgent Care Clinic and was instructed to stop taking the medication immediately. Also, in April 2010 Dr. Berger, a physician at the Santa Clara Valley Medical Center, informed Dane that his wife's SJS was due to Lamotrigine. In June 2010 Dane told his wife that she had developed SJS due to the Lamotrigine.

On July 19, 2011 the Hardins consulted an attorney to find out if pharmaceutical companies had a fund to pay for medical expenses related to adverse drug reactions. The attorney informed them that he was unaware of any such fund, but suggested they consult other counsel to investigate whether they had a viable claim of medical malpractice. It was only after this meeting that Hardin

---

[2]TENs is a life-threatening skin condition in which the top layer of skin, the epidermis, detaches from the lower layers, dermis, all over the body.

learned that SJS, TENs and serious and fatal rashes were known risks associated with Lamotrigine. Indeed, she learned sometime after July 2011 that the Food and Drug Administration required "boxed warnings" for Lamotrigine concerning the possibility that SJS and "life threatening rashes" might be caused by the drug. A "boxed warning" is the strongest warning the FDA can require and signifies that studies show a significant risk of serious or life-threatening adverse effects from taking the drug. (21 C.F.R. § 201.57(c)(1).) Boxed warnings were omitted from the print-outs Hardin had been provided by Safeway.

The printouts Safeway provided were products of software created by PDX, Inc., which Safeway used to provide patients with monographs containing useful, accurate, and comprehensive information about prescription drugs, including the appropriate warnings. Prior to 2005, PDX's software enabled its licensees to print out either the long (eight-section) or short (five section) version of the monograph for any given drug. The short version excluded sections under the headings "Before Using This Medication," "Overdose," and "Additional Information." The "Before Using This Medication" section contained warnings about taking the drug that may include warnings about drug interactions or complications due to coexisting medical conditions. In 2005, in response to regulatory guidelines, PDX revised its software so that it would no longer print the abbreviated monographs. For reasons not clear from the record, Safeway did not want to utilize the full eight-section monographs and asked PDX to revise its software so that Safeway could continue to print only the five-section versions. PDX complied with that request after it obtained a release of liability and indemnity agreement from Safeway. Safeway's decision to use the abbreviated monographs was made by

David Fong, Safeway's senior vice president of pharmacy, who oversaw 1,200 Safeway pharmacies and was responsible for their profitability.[3]

When it denied the Medical Group's and Jamieson's summary judgment motions the court wrote, in part:

> "Plaintiffs have raised triable issues of fact as to whether they are entitled to apply the 'discovery rule' for delayed accrual of the claims as to Defendant. 'The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause.' (*Jolly v. Eli Lilly & Co.* (1998) 44 Cal.3d 1103, 1109.)
>
> While it is undisputed that Plaintiffs were aware that Kathleen's injuries were caused by Lamotrigine, it does not appear that they suspected that Dr. Jamieson, or Palo Alto Foundation Medical Group . . . contributed to the injuries she sustained in early 2010. Indeed, Sharon S. Jamieson, M.D. was Kathleen's primary care physician from 2002 until June 2011. . . . The fact that Plaintiffs continued to trust Kathleen's medical care to Dr. Jamieson and PAFMG strongly suggests a level of trust that indicates Plaintiffs had no idea that either defendant may have contributed to her injury or that her injury was caused by wrongdoing. Triable issues of fact exist as to whether the confidential and fiduciary relationship of physician and patient excused Plaintiffs from greater diligence in determining the cause of Kathleen's injury. . . .
>
> Still further, triable issues of fact exist as to whether a reasonable person would have suspected the injury was caused by wrongdoing. It cannot be determined as a matter of law when the limitations period began to run by the evidence presented. Accordingly, summary judgment must be denied."

When it denied Safeway's summary judgment motion, the trial court wrote:

> "While Defendant might be considered a health care provider pursuant to MICRA in some circumstances, the court does not find

---

[3]Fong was a licensed pharmacist, although being licensed was not a requirement of his position.

6

that Defendant is a health care provider for purposes of MICRA under all circumstances.

As to the claims that Defendant failed to provide a medication guide and consultation, MICRA applies because these claims are 'directly related to the professional services provided by a health care provider acting in its capacity as such.' [Citation.] Plaintiffs concede this in arguing that the one year statute of limitations does not bar their claims. In opposition, Plaintiffs have raised triable issues of fact as to whether they are entitled to apply the 'discovery rule' for delayed accrual of the claims as to Defendant. 'The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause.' (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109.)

As to claims arising from Defendant's corporate decision to provide all patients a five paragraph 'short form' monograph, rather than an eight paragraph 'long form' monograph, thereby omitting warnings regarding medications, the court finds that Defendant has not established that MICRA applies.

The court finds that triable issues of fact exist as to whether these actions were 'directly related to the professional services provided by a health care provider acting in its capacity as such.' [Citation.] Logically, the decision does not appear to have been directly related. Further, Plaintiffs have submitted evidence that raises triable issues of fact as to whether this was a business decision completely unrelated to providing professional services as a health care provider."

Petitioners challenged the denial of their respective summary judgment motions with the petitions for writ of mandate pending before this court.[4] On April 17, 2014 we requested informal opposition and notified the parties that we were considering the issuance of a peremptory writ in the first instance, pursuant to Code of Civil Procedure section 1088 and *Palma v. Industrial Fasteners, Inc.*

___

[4]Not directly related to the issues raised by these petitions, defendants, PDX, Inc. filed an appeal of the denial of an anti-SLAPP motion. (See *Hardin v. PDX, Inc.* (A137035).)

7

(1984) 36 Cal.3d 171.  Having carefully reviewed the informal briefing, for the reasons stated below, we now issue a peremptory writ directing the trial court to grant petitioners' motions for summary judgment.

**DISCUSSION**

I.  <u>WRIT RELIEF IS APPROPRIATE IN THIS CASE</u>.

A trial court's decision denying a motion for summary judgment is properly reviewed by a timely petition for a writ of mandate.  (Code Civ. Proc. § 437c, subd. (m)(1); *American Internat. Underwriters Agency Corp. v. Superior Court* (1989) 208 Cal.App.3d 1357, 1362.)  Writ review of a superior court order is appropriate under various criteria, including situations where, as here, the lower court's order is both clearly erroneous and substantially prejudices the petitioner's case.  (See *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1273–1274.)  In this case, petitioners would be substantially prejudiced if compelled to go through trial when the statute of limitations bars the suit against them.  Our review is de novo.  (*Monticello Ins. Co. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1385.)

II.  <u>THE "DELAYED DISCOVERY" RULE DOES NOT OPERATE TO MAKE THE COMPLAINT AGAINST JAMIESON OR PAFMG TIMELY</u>.

Section 340.5 of the Code of Civil Procedure provides that an action for professional negligence against a health care provider must be brought no later than the earlier of (1) three years from the date of injury or (2) one year after the plaintiff discovers or through the use of reasonable diligence should have discovered the injury.  (Code Civ. Pro., § 340.5.)  Thus, we must consider how soon after awakening from her coma should Hardin have known she was injured by her use of Lamotrigine.

As explained by the California Supreme Court, a "plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal

8

theory, for its elements, even if he lacks knowledge thereof—when, simply put, he at least 'suspects . . . that someone has done something wrong' to him . . . 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding.' . . . He has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. . . . He has reason to suspect when he has ' " ' "notice or information of circumstances to put a reasonable person *on inquiry*" ' " ' (. . . italics in original); he need not know the 'specific 'facts' necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place — he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397–398 (citations and footnotes omitted).) "The test is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation. (*McGee v. Weinberg* (1979) 97 Cal.App.3d 798, 803.) Being put on notice does not mean necessarily that the plaintiff has complete information; rather there must simply be "a connection between the facts discovered and the further facts to be discovered that the former may be said to furnish a reasonable and natural clue to the latter." (*West v. Great Western Power Co. of California* (1940) 36 Cal.App.2d 403, 407.)

A.  Claims Brought by Hardin

In June 2010 when she awoke from her coma, Hardin was informed that she had SJS and TENs, which had been caused by the Lamotrigine. She also knew at that time that she had not been warned about those or similarly severe side effects of the medication when it was prescribed or provided to her. Her husband, both

9

from his own research and from his discussion with Dr. Berger, learned in April 2010 that the drug likely caused his wife's injuries. In other words, as of April 2010 Dane knew that his wife's conditions had been reported as adverse reactions to Lamotrigine, and in June 2010, Hardin knew her injuries were caused by the drug.

On these facts, we can only conclude that by July 2010 a reasonable person would have been put on notice to investigate the situation further. To be certain—in April 2010—one reasonable person, Dane, did so.[5] But more importantly, by June 2010 Hardin had information that Lamotrigine caused her condition that should have led naturally and directly to her asking about what was known concerning these adverse reactions. The urgent care doctor, whom she saw when she began to experience symptoms, told her to stop taking the Lamotrigine immediately. This strongly suggests the doctor was aware of a possible link between Lamotrigine and the types of symptoms Hardin was experiencing. Furthermore, when a reasonable person awakens from a coma and learns that a medication caused her condition, one would expect her to inquire whether the side effects of the medication were common or previously known.

This case is analogous to *Christ v. Lipsitz* (1979) 99 Cal.App.3d 894, 898 where a wife's pregnancy did not conclusively prove that a man's vasectomy had been ineffective, but suggested the possibility, thereby triggering the duty to investigate. Just as the Christs' case was barred because of their failure promptly to investigate the effectiveness of the husband's vasectomy once there was a

---

[5]In reviewing the denial of a summary judgment motion we do not make credibility determinations such as whether it is plausible, as stated by Hardin, for her to have suffered a debilitating effect of a medication, for her husband to know that it was a reported adverse effect, for them to have discussed her condition when she awoke from a coma, and for him *not* to have told her that she suffered known adverse reactions. Accepting those facts to be true, however, we view them as evidence that at the very least, Hardin made an unreasonably limited inquiry into her situation.

reason to believe he fathered a child after his vasectomy, so too is Hardin's case barred by her failure to investigate the possibility that the adverse effects she suffered from Lamotrigine were generally known in the medical community once she was aware the medicine caused her condition.

    1.  <u>The "Continuous Treatment" Rule Does Not Make Hardin's Claims Timely</u>.

When a patient continues to receive care from a doctor after the date of the alleged malpractice, the patient is generally excused from diligently determining the cause of his or her injury.  (See e.g., *Stafford v. Shultz* (1954) 42 Cal.2d 767, 777–778.)  This rule is premised upon the doctor's continuing duty to disclose the full extent of a patient's injuries and any likely future disability.  Anything the doctor does to conceal those facts and prevent the patient from consulting other doctors is deemed to be a fraud perpetrated by the doctor against the patient and excuses a lack of diligence on the part of the patient.  There are two reasons, however, why this rule does not apply here to excuse Hardin's lack of diligence.

First, in construing a prior version of section 340.5 of the Code of Civil Procedure, our Supreme Court held that the provision excusing a lack of diligence during nondisclosure by the health care provider applied only to the limitations period triggered by the date of injury and not to the one-year period triggered by the discovery of the alleged malpractice or when it should have been discovered had the plaintiff used reasonable diligence.  (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93.)  The Court emphasized that applying the continuous treatment exception to the period triggered by the actual discovery of the malpractice or its discovery through reasonable diligence would unreasonably, but indefinitely, suspend the limitations period even in cases where the plaintiff actually discovered or should have discovered the basis of a potential suit.  The Court considered such a result "seemingly at odds with common sense" and

11

concluded that "[t]he mere statement of [the result] argues against its acceptance." (*Id*. at 98.) Although the *Sanchez* court was interpreting a pre-1975 version of section 340.5, its logic remains valid. Thus, we decline to hold that the "continuous treatment" rule saves Hardin's causes of action for professional medical negligence.

2. Hardin Was Not Continuously Under Jamieson's Care

In addition, from April 27, 2010 through July 16, 2010, Hardin's condition was not diagnosed and treated by Jamieson, but by doctors at the Urgent Care Center in Santa Cruz, Dominican Hospital, and Santa Clara Valley Medical Center. Although Hardin continued under Jamieson's care after July 16, 2010, she had ample opportunity to discuss her condition with other physicians, including Dr. Berger, who had initially instructed her to stop taking the Lamotrigine and who directly told Dane that his wife's SJS was caused by the Lamotrigine. After coming out of her coma in June 2010 Hardin remained hospitalized, i.e., under the care of other doctors, until July 16, 2010, giving her ample opportunity to discuss her situation with them. Notwithstanding the fact that Hardin resumed receiving medical care from Jamieson after her hospitalization, she was not precluded in any way from obtaining the relevant information directly from the doctors who treated her in the Santa Cruz Urgent Care Center, Dominican Hospital, and/or Santa Clara Valley Medical Center. Thus, the level of diligence she should have shown in reasonably pursuing her claim should not be excused because she returned to Jamieson's care after her hospitalization.

Accordingly, the statute of limitations, Code of Civil Procedure section 340.5, bars Hardin's claims against both Jamieson and the Medical Group. Hardin's complaint was not filed until October 18, 2011, more than a year from the latest possible date in June 2010 when she knew or should have known of her

12

injuries from Lamotrigine.  Thus, her claims for professional negligence were not timely.

B.  <u>Dane's Claims Are Also Untimely</u>.

Dane, of course, was on inquiry notice as of April 27, 2010, because he discovered  the facts concerning his wife's injuries as of that date.  His complaint, also was not filed until October 18, 2011.  He cites *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1067, for the proposition that notwithstanding the one-year limitations period his loss of consortium claim is timely because it is derivative of his wife's claims.  *Blain*, however, simply stands for the proposition that where a plaintiff who suffered the primary injury cannot state a valid tort claim, his or her spouse cannot claim loss of consortium.  (*Ibid.*)  Admittedly, Dane's loss of consortium claim is derivative of Hardin's in the sense that it arises out of her injuries.  However, it is an independent legal claim.  (See *Leonard v. John Crane, Inc.* (2012) 206 Cal.App.4th 1274, 1279–1280 ["While joinder of a loss of consortium claim with the injured spouse's personal injury claim is encouraged, it is not mandatory and a loss of consortium claim may be maintained independently."].)  Because Dane's loss of consortium claim is separate and distinct from his Hardin's, the time period for him to have brought his claim began accruing April 27, 2010.  Thus the October 18, 2011 complaint was untimely as to Dane as well.[6]

---

[6]Even if we accepted Dane's theory—which we reject—his claims would still be untimely because it is premised on the notion that a loss of consortium claim is timely when the underlying tort claim is timely.  Here, as discussed above, Hardin's underlying claim is untimely.

III. ALL THE ALLEGATIONS AGAINST SAFEWAY FALL WITHIN THE SCOPE OF PROFESSIONAL NEGLIGENCE AND ARE, THUS, BARRED BY SECTION 340.5'S ONE-YEAR STATUTE OF LIMITATIONS.

In denying Safeway's summary judgment motion, the trial court divided the claims against Safeway into those based on conduct which occurred in the course of Safeway's capacity as a health care provider, such as not providing an adequate medication guide and consultation, and acts and decisions which were made in Safeway's corporate capacity, such as the decision to provide patients with an abbreviated monograph. With respect to the former, the court found that the Hardins raised triable issues of fact concerning the applicability of the delayed discovery rule. We reject application of the delayed discovery rule to Safeway's conduct for the same reasons we have rejected the claims against the Medical Group and Jamieson. The Hardins' delay in investigating the potential claims or filing suit was unreasonable. Thus the delayed discovery rule does not apply to toll the limitations period.

We also must reject the superior court's bifurcation of the claims against Safeway into claims of professional negligence rooted in malpractice and ordinary negligence, rooted in Safeway's corporate decision-making.[7] For purposes of deciding a summary judgment motion, the pleadings set the boundaries of the dispute. (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 499.) Paragraphs 26 through 28 of the complaint allege the Hardins' negligence claim against Safeway. The thrust of paragraph 27 accuses Safeway of providing Hardin with a dangerous drug without warning her about Lamotrigine and the risks associated with taking Lamotrigine and Effexor simultaneously. These allegations fall squarely within section 340.5's definition of professional negligence, i.e., "a

---

[7]If the statute of limitations for ordinary negligence were to apply, the Hardins would have two years to bring this claim. (Code Civ. Proc. § 335.1.)

14

negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (Code Civ. Proc. § 340.5, subd. (2).)

The closest the complaint comes to mentioning any "corporate" act by Safeway is the allegation that Safeway was negligent by "hiring, buying, purchasing drug literature from Defendant Wolters Kluwer, Inc. to be provided to Safeway customers without reviewing, supervising, correcting, and/or determining whether or not the said literature was accurate and contained all warnings that should have been given to customers when the said drug was dispensed . . . ." However, this allegation does not reflect the record before us on summary judgment. Safeway contracted with PDX to use the abbreviated monograph. If anything, this was as a means to save money or employee time. But this decision was, at most, a contributing factor to the failure of Safeway to provide Hardin adequate warnings when her prescriptions were filled by Safeway pharmacies. This resulting failure to warn Hardin of the dangers associated with Lamotrigine cannot be fairly characterized as anything other than professional negligence.

A defendant's actions towards a plaintiff are measured by one standard of care, even if the plaintiff attempts to articulate multiple theories of liability. (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 995, 998 [pleadings stated causes of action for both ordinary and professional negligence, where a patient fell off a gurney that did not have its rails raised, reversed because a defendant is only subject to a single standard of care.].) In *Bellamy v. Appellate Department* (1996) 50 Cal.App.4th 797 a patient fell when she was left unattended and unsecured on an X-ray table. The hospital claimed

15

that the action was barred by the limitations period for personal injury. (*Id.* at 799.) The court of appeal, however, held that the complaint alleged professional negligence, bringing it within the purview of MICRA because the fall occurred in the course of the hospital's rendering professional services. (*Id.* at 806.) The hospital's professional duty encompassed mundane acts such as securing the patient while on the x-ray table. So too, here.

Safeway cites persuasive authority, *Taylor v. United States* (9th Cir. 1987) 821 F.2d 1428, interpreting California law. There a hospital patient suffered permanent brain damage when his ventilator was disconnected for an undisclosed reason. The Ninth Circuit determined that MICRA applied even if the ventilator was disconnected as a result of such non-treatment-related causes as a janitor bumping a broom into the patient's bed. (*Id.* at 1432.) It was the hospital's professional duty to prevent the patient from becoming separated from the ventilator, and that duty was breached regardless of the reason the ventilator detached from the patient.

The Hardins rely on *So v. Shin* (2013) 212 Cal.App.4th 652, and *Atienza v. Taub* (1987) 194 Cal.App.3d 388, to argue that conduct furthering a health care provider's self-interest, such as Safeway's profit motive here, does not fall within the scope of rendering professional services. Both cases are readily distinguishable from this one. In *So*, an angry doctor was sued after she tried to intimidate a patient by shoving a vial containing the patient's blood and tissue at her, and then demanded that the patient not tell anyone about it. The patient sued for negligence, intentional infliction of emotional distress and assault and battery. In these circumstances, the appellate court held the doctor was being sued for acts that were outside the scope of rendering professional services. Thus, her complaint was not time barred under section 340.5. (*So v. Shin, supra,* 212 Cal.App.4th at pp. 662–673.)

16

In *Atienza v. Taub, supra,* 194 Cal.App.3d 388, a patient sued a doctor after she had an illicit affair with him. The court concluded she had no cause of action for professional negligence where the facts demonstrated that the doctor's seduction of the patient had nothing to do with his rendering medical treatment. Thus, in both cases relied upon by the Hardins the wrongdoing by health care providers occurred outside the scope of the provision of professional services. The Hardins' claim against Safeway is different. Whatever may have been Safeway's motive in using the abbreviated monograph, the Hardins are suing Safeway for the omission of information that should have been provided them when Safeway dispensed the prescribed medication. In other words, Safeway is being sued for deficiencies within the scope of its professional responsibilities as a pharmacy.

Thus, the allegations against Safeway all fall within MICRA's purview. Because the complaint alleges professional negligence against Safeway, it is subject to the limitations period described in section 340.5, and is untimely for the same reasons as the Hardins' claims against the Medical Group and Jamieson.

## CONCLUSION

Where "petitioner's entitlement to relief is so obvious that no purpose could reasonably be served by plenary consideration of the issue," the accelerated *Palma* procedure is appropriate. (*Ng v. Superior Court* (1992) 4 Cal.4th 29, 35; *Palma, supra* 36 Cal.3d 171.) As the Hardins point out, "[t]hese petitions do not involve a novel issue." We agree. After applying long-established principles to undisputed facts, the issuance of a peremptory writ in the first instance is appropriate.

Let a peremptory writ of mandate issue remanding this matter to the respondent superior court and directing the superior court to vacate its orders denying the summary judgment motions of petitioners Safeway, Inc., Palo Alto Foundation Medical Group, and Sharon S. Jamieson, M.D., dated March 14, 2014, and to issue new orders granting those motions.

17

All parties shall bear their own costs.

_____
Siggins, J.

We concur:


_____
McGuiness, P.J.


_____
Pollak, J.